# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4114-16T4

STATE IN THE INTEREST OF
J.B., JR.,

      Juvenile-Appellant.

_____

Submitted September 12, 2018 – Decided November 2, 2018

Before Judges Messano, Fasciale and Rose.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FJ-02-0002-07.

Joseph E. Krakora, Public Defender, attorney for appellant J.B., Jr. (Michele A. Adubato, Designated Counsel, on the brief).

Dennis Calo, Acting Bergen County Prosecutor, attorney for respondent State of New Jersey (William P. Miller, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel; Catherine A. Foddai, Legal Assistant, on the brief).

PER CURIAM

    Following trial in July 2011, J.B., Jr. (James), then fifty-four years of age, was adjudicated delinquent in the 1972 felony-murder of his brother, V.B.

(Val).[1]   At the time of the homicide, James was fifteen years old and Val was six years old; the State's principal eyewitness at trial was James's younger brother, M.B. (Max), who was four years old at the time of the murder.  We detailed the trial testimony in our prior opinion.  State ex rel. J.B., Jr., No. A-0366-11 (App. Div. July 11, 2013) (slip op. at 2-12).

With consent, Judge James Guida sentenced James pursuant to the more favorable provisions of the current Code of Juvenile Justice and imposed the maximum permissible sentence of twenty years' imprisonment, N.J.S.A. 2A:4A-44(d)(1)(a), consecutive to an adult sentence James was then serving.  J.B., Jr., slip op. at 1.  We affirmed the delinquency adjudication and sentence imposed. Id. at 20.  The Supreme Court denied James's petition for certification.  State in re J.B., Jr., 217 N.J. 304 (2014).

In September 2013, James filed a pro se motion to compel DNA testing. Defense counsel filed a supplemental motion one year later.  The State opposed the request.

Judge Guida heard argument on the motion and rendered his oral decision on June 15, 2015.  It is unclear from the record precisely what items James

---

[1]  We use initials as required by Rule 1:38-3(d) and pseudonyms for ease of reference.  We intend no disrespect by this informality.

A-4114-16T4

contended should be subjected to DNA testing. The proposed order submitted with James's pro se motion listed dozens of items, only some of which were admitted in evidence at trial. At oral argument, defense counsel specifically cited Val's clothing, which tested positive for the presence of blood but was not subject to DNA testing, and clippings from Val's fingernails.[2] In response to Judge Guida's questions whether this qualified as evidence "newly discovered" since the 2011 trial, defense counsel argued that current DNA testing might be more definitive, although he acknowledged that trial counsel could have sought to perform DNA testing prior to trial but choose not to do so. Although Judge Guida concluded the evidence was not "newly discovered," he continued his analysis and considered the merits of James's request. We focus our attention on those portions of the judge's decision.

Judge Guida rejected James's assertion that the State's case relied primarily on Max's unreliable and sometime contradictory statements and testimony. He noted another brother testified that he saw James wearing a blood-stained t-shirt late on the night of the murder, and that James took the

---

[2] In his appellate brief, James refers to the list contained in his pro se motion papers, noting that list included "the rubber mat from the truck" where Val's body was found, "a bloodstained truck seat, [a] bloodstained rock," found near Val's clothing, "and dirt that w[as] never tested."

A-4114-16T4

shirt off and placed it in the family's washing machine. The judge noted the medical examiner's forensic testimony, which proved Val was sodomized and corroborated Max's testimony that James routinely sexually assaulted his younger brother.

Judge Guida recalled testimony that Val's clothing was found folded neatly near the crime scene, suggesting the perpetrator "in a twisted way, cared for the victim." Most importantly, the judge recounted James's numerous statements to law enforcement and other witnesses over the years in which he "attack[ed] the evidence collaterally without specifically denying" his involvement.

The judge referenced the testimony of M.M., who said James admitted killing his brother on two occasions; E.A., who claimed James essentially admitted his involvement on numerous occasions over the years; J.G., who heard James admit to the murder; and James's former sister-in-law, C.R., who heard James threaten her husband (another brother) and daughter by saying he would kill them "like he killed his brother." Judge Guida noted that James tried to implicate another witness, J.G., in the murder even though the two had been friends for years. Years later, when J.G. asked James if police had ever located Val's killer, James said, "I didn't mean to do it." The judge found these witnesses

4

credible and concluded the State's case was "built not only on the testimony of the eyewitness, [Max]."

Although Judge Guida agreed that the identity of Max's killer was a significant issue in the case, he found that James failed to demonstrate "the evidence sought [was] material to the issue of identity," because the other evidence as to identity was "overwhelming." See N.J.S.A. 2A:84A-32a(d)(4). The judge also found that the "requested DNA testing result[s] . . . would not raise a reasonable probability that a new trial would be granted." See N.J.S.A. 2A:84A-32a(d)(5). The judge reasoned that even if the testing of Val's clothing revealed the presence of DNA of persons other than James, the evidence would not "void or vitiate the culpability . . . of [James]."

Judge Guida denied the motion and entered a conforming order the next day. This appeal followed.

Before us, James raises the following argument:

> POINT I
>
> THE JUVENILE'S MOTION FOR POST-CONVICTION DNA TESTING PURSUANT TO N.J.S.A. 2A:84A-32a SHOULD HAVE BEEN GRANTED.

When the case was tried before Judge Guida, and when he decided the motion for DNA testing, N.J.S.A. 2A:84A-32a (the Statute) "permit[ted] '[a]ny

person who was convicted of a crime and is currently serving a term of imprisonment' to make a motion for DNA testing." State v. Hogue, 175 N.J. 578, 584 (2003) (alteration in original) (quoting N.J.S.A. 2A:84A-32a(a) (2015)).[3] The court "shall not grant the motion . . . unless" the defendant has established

> (1) the evidence to be tested is available and in a condition that would permit the DNA testing . . . ; (2) the evidence to be tested has been subject to a chain of custody sufficient to establish it has not been substituted, tampered with, replaced or altered in any material aspect; (3) the identity of the defendant was a significant issue in the case; (4) the eligible person has made a prima facie showing that the evidence sought to be tested is material to the issue of the eligible person's identity as the offender; (5) the requested DNA testing result would raise a reasonable probability that if the results were favorable to the defendant, a motion for a new trial based upon newly discovered evidence would be granted. The court in its discretion may consider any evidence whether or not it was introduced at trial; (6) the evidence sought to be tested . . . was not tested previously; . . . [or] it was tested previously, but the requested DNA test would provide results that are reasonably more discriminating and probative of the identity of the offender or have a reasonable probability

_____

[3] The Statute was amended, effective March 1, 2016. See L. 2015, c. 127, § 1. It now states, "Any eligible person may make a motion before the trial court that entered the judgment of conviction for the performance of forensic DNA testing." N.J.S.A. 2A:84A-32a(a). The term "eligible person" includes "anyone who was convicted of a crime . . . and is currently serving a sentence imposed for that criminal conviction which includes a period of imprisonment." N.J.S.A. 2A:84A-32a(n).

A-4114-16T4

of contradicting prior test results; (7) the testing requested employs a method generally accepted within the relevant scientific community; and (8) the motion is not made solely for the purpose of delay.

[N.J.S.A. 2A:84A-32a(d) (emphasis added).]

See State v. DeMarco, 387 N.J. Super. 506, 514-15 (App. Div. 2006) (discussing the statutory framework). "It is defendant's burden to establish that all of the elements necessary for DNA testing have been fulfilled." State v. Armour, 446 N.J. Super. 295, 311 (App. Div.), certif. denied, 228 N.J. 239 (2016) (citing State v. Peterson, 364 N.J. Super. 387, 392-93 (App. Div. 2003)).

The Statute "does not require a defendant to 'prove the DNA results will be favorable, rather it must only be established that there is a reasonable probability that a new trial would be granted if the DNA results are favorable to the defendant.'" Ibid. (quoting State v. Reldan, 373 N.J. Super. 396, 402 (App. Div. 2004)). "[T]he 'reasonable probability' requirement set forth in subsection (d)(5) 'applies only to the grant of a new trial in the event the results of DNA testing are favorable.'" Id. at 312 (quoting DeMarco, 387 N.J. Super. at 517).

To obtain a new trial based upon newly discovered evidence, a defendant must demonstrate the evidence is: "1) material, and not 'merely' cumulative, impeaching, or contradictory; 2) that the evidence was discovered after completion of the trial and was 'not discoverable by reasonable diligence

7

beforehand'; and 3) that the evidence 'would probably change the jury's verdict if a new trial were granted.'" State v. Ways, 180 N.J. 171, 187 (2004) (quoting State v. Carter, 85 N.J. 300, 314 (1981)).  A defendant must establish all three prongs in order to be granted a new trial.  Ibid.

"A trial court's decision regarding N.J.S.A. 2A:84A-32a is premised upon the court's judgment and discretion." Armour, 446 N.J. Super. at 306 n.4 (citing N.J.S.A. 2A:84A-32a(d)(5)).  We in turn review the court's ruling for an "abuse of discretion." Ibid.  However, "our review of a trial court's legal determinations . . . is de novo."  Ibid. (citation omitted).

James's primary argument is that contrary to Judge Guida's conclusion regarding the "overwhelming" evidence adduced by the State, the prosecution was "based on circumstantial evidence."  James contends that if, for example, testing Val's fingernail clippings revealed DNA from someone other than himself, "the evidence would be material to the identity of the perpetrator." James argues the judge mistakenly exercised his discretion in concluding favorable DNA evidence would not "raise a reasonable probability that . . . a motion for a new trial . . . would be granted."  N.J.S.A. 2A:84A-32a(d)(5).

We disagree and affirm substantially for the reasons expressed by Judge Guida.[4] We add only the following.

In Peterson, we held "that the strength of the evidence against a defendant is not a relevant factor in determining whether his identity as the perpetrator was a significant issue." 364 N.J. Super. at 396. However, one year later, we held "[a] defendant cannot compel the State to release the evidence for DNA testing where the evidence at trial was overwhelming and the defendant did not present a defense or alibi that would be consistent with the explanation the DNA [testing] results might supply." Reldan, 373 N.J. Super. at 402-03.

We have since construed Peterson's holding "narrowly and limited to its facts." Armour, 446 N.J. Super. at 314. We specifically have noted that in Peterson, favorable DNA results could have both exculpated the defendant and inculpated another because "the identity of the murderer was likely (and almost certainly) the person whose DNA was found at the crime scene." Id. at 315 (citing Peterson, 364 N.J. Super. at 392). Whereas in Reldan, favorable DNA

---

[4] We note, without concluding the distinction makes a difference in our analysis, that in this case, the fact finder at trial was Judge Guida, not a jury, and the judge explicitly found that favorable DNA evidence would not have changed his verdict. See, e.g., Peterson, 364 N.J. Super. at 398-99 (discussing the type of DNA evidence compelling the grant of a new trial as "the sort that would probably change the jury's verdict if a new trial were granted") (quoting Carter, 85 N.J. at 314).

evidence standing alone would neither exculpate defendant nor inculpate another. Ibid. (citing Reldan, 373 N.J. Super. at 404).

Judge Guida's factual findings make this case more like Reldan than Peterson in that the State's evidence was substantial, not limited to the eyewitness testimony of four-year-old Val, and largely based on James's own implicit or explicit inculpatory admissions to several witnesses during the decades after the murder. It also included the circumstantial eyewitness testimony of James's other brother. Even if we were to "postulate whatever realistically possible test results would be most favorable to defendant," Peterson, 364 N.J. Super. at 397, "that would not change the jury's verdict where, as here, there was overwhelming evidence linking [James] to the crimes." Reldan, 373 N.J. Super. at 404.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4114-16T4