**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2458-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

CARLOS ALVES,

    Defendant-Appellant.

_____

        Submitted December 11, 2023 – Decided December 18, 2023

        Before Judges Sabatino and Chase.

        On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 99-10-3250.

        Joseph E. Krakora, Public Defender, attorney for appellant (Laura B. Lasota, Assistant Deputy Public Defender, of counsel and on the brief).

        Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Braden Bendon Couch, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

This criminal case arising from a 2001 murder conviction returns to this court a sixth time.[1] We need not recite the lengthy factual and procedural history here, which is familiar to the parties, and instead incorporate by reference the details stated in our five prior opinions.

The following background will suffice for the present appeal. At around noon on August 14, 1999, Maria Lobo, the girlfriend of defendant Carlos Alves, was found dead in the New Jersey apartment they shared. Lobo died from strangulation.

The parties had been together on August 11, 1999, which was the last time Lobo was seen alive by third parties. Defendant left the United States on a flight to Portugal on August 12. According to defendant, he left the country suddenly after being informed his father in Portugal was very ill and near death.

The State medical examiner placed Lobo's time of death as being approximately seventy-two hours before her body was found, i.e., on or about August 11. Defendant's expert, meanwhile, estimated the time of death at thirty-

---

[1] State v. Alves, No. A-2944-15 (App. Div. Mar. 12, 2018), certif. denied, 236 N.J. 14 (2018); State v. Alves, No. A-4755-13 (App. Div. Oct. 6, 2016); State v. Alves, No. A-5979-10 (App. Div. July 16, 2012), certif. denied, 213 N.J. 387 (2013); State v. Alves, No. A-6331-07 (App. Div. Apr. 19, 2010), certif. denied, 203 N.J. 440 (2010); State v. Alves, No. A-4355-00 (App. Div. Jan. 23, 2003), certif. denied, 178 N.J. 455 (2004).

six to forty-eight hours before the discovery of her body, i.e., on or about August 12 or 13.

Defendant denied that he killed Lobo. He claimed he was with Lobo on the morning of August 12, that they had both left the apartment, had stopped together at a bakery, and then went off separately to their respective jobs.

Defendant maintained he was in Portugal when Lobo was attacked. He theorized the murderer could have been an intruder into the apartment, because Lobo's pocketbook and keys were missing.

Tried by a jury in 2001, defendant was found guilty of first-degree murder. The trial court sentenced him to thirty years imprisonment with a thirty-year period of parole ineligibility.

After his conviction was affirmed on direct appeal and his first petition for post-conviction relief ("PCR") was denied, defendant filed an application with the trial court seeking post-conviction discovery of DNA evidence. Eventually, the court granted defendant's request to have DNA testing performed on several items from the crime scene, including a towel found at the crime scene and fingernail clippings from both of Lobo's hands.

The resulting DNA evidence from the towel and nail clippings revealed that defendant's DNA was one of the two DNA profiles found in those items. In

particular, defendant's Y-STR DNA profile matched the Y-STR profile under both sets of Lobo's tested fingernails.[2]  In addition, defendant's STR DNA

---

[2]  Within the field of DNA science, the abbreviation "STR" stands for "short tandem repeat."  In State v. Deloatch, 354 N.J. Super. 76, 80 (App. Div. 2002), we explained that in STR testing, "a very small piece of a substance (i.e. blood, semen, etc.) is extracted and then, through a chemical process, visualized and identified as human DNA."

The National Institute of Justice has explained the significance of the term "STR" and the related term pertinent to this case, "Y-STR," as follows:

> Among the 3 million or so DNA bases that do not code for proteins are regions with multiple copies of short repeating sequences of these bases, which make up the DNA backbone.  These sequences repeat a variable number of times in different individuals.  Such regions are called "variable number short tandem repeats," and they are the basis of STR analysis.  A collection of these can give nearly irrefutable evidence statistically of a person's identity because the likelihood of two unrelated people having the same number of repeated sequences in these regions becomes increasingly small as more regions are analyzed.

> Autosomal chromosomes are those not involved in determining a person's gender, and STRs on these chromosomes are called autosomal STRs.  Other STRs used for forensic purposes are called Y-STRs, which are derived solely from the male sex determining Y chromosome.  Profiles based on autosomal STRs provide far stronger statistical power than profiles based on Y-STRs, because autosomal DNA is randomly exchanged between matched pairs of chromosomes in the process of making egg and sperm cells. . . .  Profiles based on Y-STRs are statistically weaker because only

A-2458-21

profile matched the "minor" STR DNA profile under one of Lobo's hands. His STR DNA profile was excluded, however, as a contributor to the "major" STR DNA profile found under either hand.

Other results obtained from the DNA testing were not of sufficient quantity or quality, or both, to be compared with defendant's reference sample. Further, no satisfactory reference sample of Lobo's own DNA was provided to the laboratory.

Defendant moved for a new trial, arguing that the DNA evidence supported his theory of a third-party intruder and tended to exculpate him as the assailant. The trial court conducted an evidentiary hearing to address the issues.

Following the hearing, the trial court denied defendant's motion. Specifically, the court concluded that defendant had not met the first or third prongs of the standards for a new trial set forth in State v. Carter, 85 N.J. 300, 314 (1981), and State v. Peterson, 364 N.J. Super. 387, 398 (App. Div. 2003).

---

males have a Y chromosome and all males get theirs from their fathers, so all males in any paternal line have nearly identical Y chromosomes. . . .

[Nat'l Inst. of Just., What is STR Analysis?, NIJ.OJP.GOV (March 2, 2011), https://nij.ojp.gov/topics/articles/what-str-analysis (emphasis added).]

Those standards focus on whether the newly discovered DNA evidence would affect the jury's verdict, when compared with the State's proofs and the defense presented at trial. The court held that the DNA evidence was insufficiently exculpatory to warrant a new trial. This appeal ensued.

In his brief on appeal, defendant presents the following argument:

POINT I

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED DNA EVIDENCE.

Our consideration of this argument is guided by well-established principles. In order to obtain a new trial based upon a claim of newly discovered evidence, a criminal defendant must establish several things. Such newly discovered evidence is sufficient to warrant a new trial only if it is: "(1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." Carter, 85 N.J. at 314 (citing State v. Artis, 36 N.J. 538 (1962)); see also Peterson, 364 N.J. Super. at 398. All three prongs of the Carter test must be satisfied to grant a new trial. 85 N.J. at 314.

A-2458-21

Our scope of review of a determination of a motion for a new trial is limited. Such a determination is committed to the "sound discretion of the trial judge" and "will not be interfered with on appeal unless a clear abuse has been shown." State v. Armour, 446 N.J. Super. 295, 306 (App. Div. 2016) (quoting State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000)); see also State v. Fortin, 464 N.J. Super. 193, 216 (App. Div. 2020). The burden remains on the defendant to establish each prong of the new trial standards. Fortin, 464 N.J. Super. at 217 (citing State v. Smith, 29 N.J 561 (2017)).

When the new trial motion is based, as here, upon post-verdict testing of evidence, "even the most favorable retesting outcome . . . must be weighed against the compelling proofs presented by the State." Armour, 446 N.J. Super. at 313 (discussing new trial motion after retesting of DNA). "DNA test results that not only tended to exculpate defendant but to implicate someone else would be evidence of 'the sort that would probably change the jury's verdict if a new trial were granted.'" Peterson, 364 N.J. Super. at 398-99 (quoting Carter, 85 N.J. at 314). The court has "to consider the evidential significance of whatever 'favorable' DNA test results were obtained in light of the overall trial record to determine whether defendant was entitled to a new trial." Id. at 397.

The trial court correctly applied these standards in considering defendant's

motion and did not abuse its discretion in denying a new trial. We affirm, substantially for the reasons articulated by the trial court in its detailed oral opinion of February 14, 2022.

The trial court held defendant failed to satisfy the first prong of the Carter test because the "DNA results d[id] not exculpate defendant at all[, a]nd, in fact provide[d] further evidence that he was the murderer." The court further noted defendant had argued to the jury at trial his DNA would not be found under Lobo's fingernails, yet the post-conviction testing revealed his DNA was found under them.

The trial court also underscored that the DNA evidence examined by the forensics laboratory was not linked to "any third party." Hence, the DNA did not implicate any other perpetrator of the killing and was "not of sufficient weight that would alter the outcome of the verdict in a new trial."

Additionally, the trial court found defendant had not met the third prong of Carter. The court ruled the "DNA evidence would not have been likely to change the outcome of the trial." The jury had convicted defendant without the State presenting any inculpatory DNA evidence, thus allowing defendant to argue, albeit unpersuasively, the absence of any such evidence. The court also noted the jury had not been convinced by any of Alves's arguments during trial

hypothesizing an unidentified third-party intruder.

Evaluating the evidence as a whole, the trial court concluded that the eyewitnesses, the State's medical examiner's testimony, and the conduct of defendant "abscond[ing] to Portugal the day after the alleged murder" provided ample grounds to convince the jury to convict. The court noted that, even if one accepted the defense expert's alleged time frame for Lobo's death, "there's an approximately [three-and-a-half] hour window" which "gave . . . defendant the opportunity to murder [Lobo]."

We endorse this sound reasoning. Defendant argues that the one "minor" profile from Lobo's right fingernail clippings that matched his own was "not inculpatory," because he and Lobo "were in a cohabitating romantic relationship and had spent time together on the morning of August 12, 1999." He also stresses that his DNA did not match the "major" STR DNA profiles obtained from Lobo's fingernails.

These arguments are insufficient to warrant a new trial. The presence of any kind of match—major or minor—of defendant's DNA to the DNA under the victim's fingernails does not exonerate defendant. Indeed, the finding conflicts with his assertion at trial that none of his DNA would be found there.

A-2458-21

We recognize the DNA evidence does not show definitively the "major" STR DNA profile is Lobo's. But that uncertainty is in all likelihood explained by the lack of a reference sample of her DNA.

Defendant further asserts that his paternal male relatives cannot be excluded as potential contributors to the Y-STR DNA profiles found by the testing. But there is no evidence from the trial that any of his paternal male relatives resided in New Jersey in 1999, instead of in Portugal or elsewhere.

We concur with the trial court's assessment of the strength of the State's non-DNA proofs of guilt. The State's evidence included witness statements attesting that Lobo was found in the same clothes she had been wearing on August 11, that she failed to appear for work on August 12 or 13 without providing notice, as was her custom, and the statement from a neighbor regarding defendant's actions while in Portugal. The State further provided evidence that no calls were made by defendant from Portugal to the apartment between August 12 and 14. And, as we have noted, even the defense expert's time frame allowed defendant the opportunity to commit the murder.

In sum, the trial court was well within its "sound discretion" in denting defendant's new trial motion. The DNA evidence was simply inadequate to

exonerate defendant or cast sufficient doubt upon the State's powerful evidence of his guilt.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2458-21