**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0984-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

TATIANNA I. HARRISON,

     Defendant-Appellant.

_____

Submitted February 2, 2021 – Decided May 24, 2021

Before Judges Fisher, Moynihan and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment No. 16-05-1381.

Edward Crisonino, attorney for appellant.

Gurbir S. Grewal, Attorney General, attorney for respondent (Debra G. Simms, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant Tatianna I. Harrison was tried by jury[1] for first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2) and corresponding gun charges related to the death of a victim who died from a single gunshot wound to his head. Found guilty of all indicted crimes, she appeals her conviction arguing:

> POINT ONE
>
> ADMISSION OF DEFENDANT'S STATEMENT WAS IN ERROR.
>
> POINT TWO
>
> THE PROSECUTOR'S REMARKS DURING CLOSING WERE IMPROPER.
>
> POINT THREE
>
> THE NEWLY DISCOVERED EVIDENCE REQUIRED THE TRIAL COURT TO GRANT A NEW TRIAL.

Unpersuaded by any argument, we affirm.

I

In determining defendant's motion to suppress, the trial judge considered three discrete statements she made to law enforcement officers. She made the

---

[1] Defendant was sixteen years old at the time of the homicide. A Family Part judge granted the State's motion to involuntarily waive the Family Part's jurisdiction allowing defendant to be tried in adult court. See N.J.S.A. 2A:4A-26 (the statute still in effect at the time of the juvenile waiver hearing).

A-0984-18

first to Berlin borough police officer Eric Wolf, Sr., who responded to defendant's home in Berlin two days after the victim had been shot in Camden on August 12, 2015, to ascertain defendant's well-being after the officer received a report that, after her grandmother reported defendant missing, defendant's mother advised police she had returned home and was threatening to harm herself and others. The second statement was made that same day to Berlin borough police officer Robert Murray, who had arrived at defendant's home just as Wolf walked the handcuffed defendant down the driveway before transporting her to a hospital crisis center; Murray greeted defendant asking, "Hey Tatianna, how are you doing, what's going on?" The third was a recorded audio statement given to Camden County Police Department Metro Division detectives Dennis Convery and Edward Gonzales at a juvenile detention facility. In her merits brief, defendant challenges only the recorded audio statement, not the statements she made to Wolf—"I shot him, I shot that boy," specifying that she shot him in the back of the head with a hollow-nose bullet—or Murray—"I shot that boy in the back of the head with a hollow."

A-0984-18

As such, we will consider only defendant's argument that her recorded statement to the detectives should be suppressed.[2] See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011) (holding that issue not briefed on appeal is deemed waived).

After a N.J.R.E. 104 hearing at which Wolf and Convery testified, the trial judge found both credible. The one-hour-five-minute audio recording of defendant's statement was also played in open court. From the trial judge's record-supported findings, we glean the facts pertinent to defendant's challenge to the admission of her statement to the detectives. See State v. Boone, 232 N.J. 417, 425-26 (2017) ("An appellate court reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the trial court's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'") (quoting State v. Scriven, 226 N.J. 20, 40 (2016)). We defer to the trial judge's determination of facts "because those findings 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Gamble, 218 N.J. 412, 424-25 (2014) (alteration in original)

---

[2] The trial transcripts do not list Murray as a witness, ostensibly confirming the assistant prosecutor's representation to the trial judge that the State did not plan on eliciting defendant's statement to Murray at trial during its case-in-chief.

(quoting State v. Johnson, 42 N.J. 146, 161 (1964)); see also State v. Tillery, 238 N.J. 293, 314 (2019) (extending deference to trial-court findings based on recordings).

After defendant told Wolf of the shooting and said it had occurred in Camden, Wolf contacted Camden police to inquire if there had been any shootings at the location defendant had disclosed to him. He eventually spoke with Convery and provided Convery with the contact information for defendant's grandmother who had reported her missing.

When Convery called the contact number, defendant's mother—who has the same surname as defendant's grandmother—answered and identified herself. She advised Convery defendant was at the crisis center, and that she was seeking to have defendant's juvenile probation violated so she could be detained.

After defendant was released from the crisis center and transported to the juvenile detention facility, Convery, unsuccessful at reaching anyone using the contact phone number, went to defendant's home. Defendant's mother agreed to meet him at the detention facility. He told her he was going to take a statement from defendant to further explore defendant's prior statement that she had shot someone in Camden.

A-0984-18

Convery, Gonzales and defendant's mother were in "a classroom[-]type area" as Convery reviewed a "Juvenile Statement of Rights" form "line by line," advising defendant of her Miranda rights, see Miranda v. Arizona, 384 U.S. 436 (1966), as well as those accorded juveniles, see State in the Int. of A.A., 240 N.J. 341 (2020); State ex rel. A.S., 203 N.J. 131 (2010); State v. Presha, 163 N.J. 304 (2000). The judge found defendant

> answered affirmatively to having answered each question as she did so and she and [her mother] each signed off on the form. [Defendant] agreed to waive her right to remain silent and to counsel and further agreed to give a statement. She read out loud a portion of the form acknowledging this. Likewise, [her mother] read out loud that she had been advised of all of [defendant's] rights and consented to [defendant] waiving her rights and to answering the questions and to give a statement.

Defendant then gave a detailed account of the prelude to the shooting, her shooting of the victim and the aftermath.

Although we defer to the trial judge's findings of fact, we owe no deference to his conclusions of law, which we review de novo. State v. Watts, 223 N.J. 503, 516 (2015). That review requires our determination if the State proved beyond a reasonable doubt that defendant's waiver of the privilege against self-incrimination was knowing, intelligent and voluntary in light of all

A-0984-18

the circumstances.  Presha, 163 N.J. at 312-13.  We utilize the familiar polestar in our analysis:

> At the root of the inquiry is whether a suspect's will has been overborne by police conduct.  In determining whether a suspect's confession is the product of free will, courts traditionally assess the totality of circumstances surrounding the arrest and interrogation, including such factors as "the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved." State v. Miller, 76 N.J. 392, 402 (1978).  Additionally, "[a] suspect's previous encounters with the law has been mentioned as [a] relevant factor."  Ibid.  We reaffirm those factors as germane to an evaluation of the admissibility of either adult or juvenile confessions.
>
> [Id. at 313.]

Defendant argues the totality of the circumstances "weighed heavily in favor of the suppression of the statement" in light of "defendant's unbalanced mental health, cognitive limitations, the misleading representations of law enforcement, and the lack of parental presence as defined by our law[.]"  We disagree.

In her merits brief, defendant notes Wolf had brought her to the crisis center the day prior to her statement; and avers she suffers from bipolar disorder

A-0984-18

and had not taken her medications prior to admission to the center.  She makes no specific argument how these conditions impacted her statement.

The trial judge considered defendant's more expansive argument regarding her intelligence, education and experience and concluded "[t]he information submitted to the court relative to th[o]se factors [to be] a mixed bag."  The judge found "[d]efendant ha[d] an IEP[3] classification of a learning disability and a low IQ"; was "considered cognitively limited with difficulty understanding basic questions"; "suffer[ed] from ADHD and bipolar disorder for which she is prescribed medication."  He also observed defendant's statement referenced that she "was off of prescribed medication until her time" at the crisis center.  But the judge also considered evidence that "defendant does excellent at school[,] . . . was the student of the month and was an honor roll student."  The judge highlighted defendant's "responsive answers to numerous detailed questions" and the "absence of any expert opinion [about the impact of] . . . defendant's mental condition or the effect of taking or not taking certain medications" as supporting the voluntariness of her statement.

---

[3] An "IEP," or "individualized education program," is written statement for a child with a disability that includes information about the child's current academic performance, the child's annual academic goals, instructions for tracking the child's progress, and other details relating to the child's learning environment and necessary accommodations.  20 U.S.C. § 1414(d)(1)(A)(i).

A-0984-18

Deferring to those factual findings, we perceive no evidence that defendant's mental or cognitive states rendered her statement involuntary. As we observed in State v. Smith:

> The fact that defendant was suffering from a mental illness at the time of the questioning did not render his waiver or his statement involuntary. The United States Supreme Court has held that "coercive police activity is a necessary predicate to [a] finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986). The Court stressed that the "Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" Id. at 170 (quoting Oregon v. Elstad, 470 U.S. 298, 304-05 (1985)). "The voluntariness of a waiver of this privilege [was said to] depend[] on the absence of police overreaching, not on 'free choice' in any broader sense of the word." Ibid. The Court added that "the relinquishment of the right [to remain silent] must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. . . ." Ibid. (citing Moran v. Burbine, 475 U.S. 412, 421 (1986)).
>
> [307 N.J. Super. 1, 10-11 (App. Div. 1997) (alterations in original).]

Nothing in the record supports the argument that the detectives exploited defendant's mental illness or cognitive status to obtain her statement.

Defendant's claim of "misleading representations" by the detectives is based on her contention that Convery gave defendant's mother "the indication

A-0984-18

that he was attempting to help the juvenile [defendant]" and the mother "then reiterated this to [defendant], telling her she [would be] going to 'come home to mommy[,'] 'given protective custody, and . . . going to a new house to live.'" Defendant argues the detectives "did nothing to correct this perception, in fact they escalated it," telling defendant it was "okay to open up"; she did not "have to stay closed in all the time"; and "repeatedly told her that they were trying to help her." She asserts "[t]he entire theme of . . . defendant's statement was that the police were there to help her, which [was] far from the truth and contradictory to the Miranda warnings."

"Although police misrepresentations are relevant in analyzing the totality of the circumstances surrounding a claim that a confession was involuntary," State v. Pillar, 359 N.J. Super. 249, 269 (App. Div. 2003), such misrepresentations "alone are usually insufficient to justify a determination of involuntariness or lack of knowledge. Moreover, a misrepresentation by police does not render a confession or waiver involuntary unless the misrepresentation actually induced the confession," State v. Cooper, 151 N.J. 326, 355 (1997) (citations omitted); see also Pillar, 359 N.J. Super. at 269.

We agree with the trial judge that the detectives did not explicitly contradict the Miranda warnings. There was one point, well after defendant

explained how she had shot the victim, that Convery showed defendant a photograph of the victim and asked, "Who's that?" Convery explained to the trial judge at the evidentiary hearing that defendant "turned her head away from the photograph so that she wasn't looking at it." The following colloquy ensued after defendant gave no audible response:

> DETECTIVE GONZALES: Why did you look away? It's okay to talk to us, [defendant]. We're here trying to help. Who is it?
>
> [DEFENDANT]: I don't know.
>
> DETECTIVE CONVERY: You don't know who this is?
>
> [DEFENDANT]: No.
>
> DETECTIVE CONVERY: But you recognize the person.
>
> DETECTIVE GONZALES: It's okay to open up, [defendant]. You don't have to stay closed in all the time, okay?
>
> DETECTIVE CONVERY: Are you all right? What's wrong? Did you tell anybody who did this besides the officers?
>
> [DEFENDANT]: No.
>
> DETECTIVE CONVERY: So is there a reason why somebody would be trying to claim what you did, or you trying to claim what someone else did?

11

[DEFENDANT]: Uh-uh.

DETECTIVE CONVERY: Were you with anybody else that would know more information than you know?

[DEFENDANT]: I told everybody to leave.

DETECTIVE CONVERY: So you walked up by yourself, just you and him? Or you guys walked up as a group?

[DEFENDANT]: By myself.

DETECTIVE CONVERY: Okay. So who is this picture? Do you know his name? Do you know the street name? Do you know what they called him? Do you want me to put the picture away?

Convery testified "[a]fter a few questions which she wasn't answering as much, I then put the photograph away, at which time she turned back and engaged in conversation and made eye contact again."

Gonzales's statements that it was "okay to open up" and defendant did not "have to stay closed in all the time" arguably contradicted defendant's right to remain silent. But it was obvious defendant didn't open up. Gonzales's statements did not induce any part of the confession so as to "render [the] confession or waiver involuntary." Cooper, 151 N.J. at 355.

We disagree with the remainder of defendant's arguments based on the skewed view of the record she advances. Although Convery did tell defendant

he wanted to help her, he did so primarily in the context of ascertaining if, as defendant ultimately contended, someone other than she had shot the victim as evidenced by exchanges after defendant finished describing the shooting:

DETECTIVE CONVERY:  Now when you shoot, if you shoot semi-automatic, the difference between a revolver and a semi-automatic is semi-automatic will eject or kick out the shell casing.

[DEFENDANT]:  That's what.

DETECTIVE CONVERY:  Okay.  What happened to that casing?  Did you grab it?

[DEFENDANT]:  (No verbal response.)

DETECTIVE CONVERY:  No?

[DEFENDANT]:  I didn't stay for nothing.  I looked at the guy.

DETECTIVE CONVERY:  Was there anybody else there?

[DEFENDANT]:  Not around.

DETECTIVE CONVERY:  [Defendant], here's the deal, you've gotta tell me the truth.  You understand me?  If you were there, you were there.  But if somebody else did it, there's a difference.  You understand what I'm saying?

[DEFENDANT]:  Mm-hmm.

DETECTIVE CONVERY:  I don't want you trying to claim somebody[] else's stuff for stupid reasons.

13

[DEFENDANT]: I would never claim someone else's stuff.

DETECTIVE CONVERY: All right. Would somebody, one of your boys, try to claim some of your stuff?

[DEFENDANT]: They did before.

DETECTIVE CONVERY: And that's why I want to find out who you're hanging out with, because somebody has more information or knows more about something than you do. So I'm going to ask you this. Did you actually pull the trigger, or was it somebody else and you were just there with them?

[DEFENDANT]: It was me.

Convery later pressed defendant again to tell him who shot the victim:

DETECTIVE CONVERY: Did you recognize the picture I showed you earlier when you turned away?

[DEFENDANT]: Yeah.

DETECTIVE CONVERY: Who was that?

[DEFENDANT]: Another person I don't like.

DETECTIVE CONVERY: Who was it?

[DEFENDANT]: He's dead.

DETECTIVE CONVERY: He's dead?

DETECTIVE GONZALES: How do you know he's dead? [Defendant], how do you know he's dead?

14

[DEFENDANT]: 'Cause.

DETECTIVE CONVERY: 'Cause why? Did somebody shoot him?

[DEFENDANT]: He's dead.

DETECTIVE CONVERY: Who shot him?

[DEFENDANT]: He is dead.

DETECTIVE CONVERY: Who shot him?

[DEFENDANT]: He's dead.

DETECTIVE CONVERY: Who shot him?

[DEFENDANT]: Me.

Despite her constant admissions that she had shot the victim, he questioned her once again:

DETECTIVE CONVERY: I'm going to show you this picture again, all right? Is this the person that you're saying was shot?

[DEFENDANT]: (No verbal response.)

DETECTIVE CONVERY: Okay. And you're saying that you shot him?

[DEFENDANT]: (No verbal response.)

DETECTIVE CONVERY: Who was with you when it happened?

[DEFENDANT]: (No verbal response.)

15

A-0984-18

DETECTIVE CONVERY: Okay. [Defendant], who actually pulled the trigger?

[DEFENDANT]: Me. I was told to so I did it.

DETECTIVE CONVERY: You were told to. Who told you to do it?

[DEFENDANT]: I did it. It doesn't matter know who told—

DETECTIVE CONVERY: It does matter, to me it does.

[DEFENDANT]: Well to me it doesn't.

DETECTIVE CONVERY: Listen, listen, listen. I don't know what the answer's going to be for this but I'm going to ask you anyway. Do you care about yourself?

[DEFENDANT]: No.

DETECTIVE CONVERY: Okay. Now here's a more important question. Do you care about your mom?

[DEFENDANT]: Not really.

DETECTIVE CONVERY: What about your brother?

[DEFENDANT]: No.

DETECTIVE CONVERY: Then who do you care about?

[DEFENDANT]: Nobody.

DETECTIVE CONVERY: Why not?

16

[DEFENDANT]: 'Cause.

DETECTIVE CONVERY: Because why? Why? Your mom wants—

[DEFENDANT]: What's there to live for?

DETECTIVE CONVERY: Your mom, your brothers. How many brothers you got?

[DEFENDANT]: Three.

DETECTIVE CONVERY: You don't want no nieces and nephews, you don't want no kids, none of that? Why not?

[DEFENDANT]: 'Cause I want to be a killer.

DETECTIVE CONVERY: Okay. But yet it doesn't get you far, right? What's your favorite food?

[DEFENDANT]: Fries.

DETECTIVE CONVERY: French fries? What about your favorite drink?

[DEFENDANT]: I don't know.

DETECTIVE CONVERY: You don't know? You don't like milk, Pepsi?

[DEFENDANT'S MOTHER]: Smoothies.

DETECTIVE CONVERY: Smoothies?

[DEFENDANT]: No.

A-0984-18

DETECTIVE CONVERY: Mom always buys you smoothies she's saying. I'm trying to help you out as much as I can, all right. If you did it, then you did it. But if somebody told you to do it, you have to tell me who told you.

[DEFENDANT]: The person that told me to do it is nowhere in the state no more it don't matter.

Defendant attempts to analogize the detective's statements in A.S.—where the detective told the defendant "that answering his questions would show that she was a 'good person' and would actually benefit her," 203 N.J. at 151—to Convery's statements. The Court held "[n]ot only was the veracity of [the detective's statements to A.S.] dubious, a fact of which an attorney would have made A.S. aware, it also contradicted the Miranda warning provided to A.S.: that anything she said in the interview could be used against her in a court of law." Ibid.

The detective's actions in this case were different. The record evidences that Convery attempted to learn from defendant, even after she had confessed, if someone else pulled the trigger. By telling her he was trying to help her, he did not vitiate the Miranda warnings. And it must be remembered defendant provided the chilling details of her motive, planning and homicidal act before the detectives said any of the remarks that defendant describes as misleading representations.

18

We also note that defendant was not a fourteen-year-old "of tender sensibilities [who] may have great difficulty withstanding the rigors of a police interrogation," as was the defendant in A.S. Id. at 149. Defendant had previous involvement with the juvenile justice system. She was a gang member with "First Lady" status in her Crip set. She admitted both formulating a calculated plan to shoot the victim in a public space as an act of retribution and carrying out that plan. She was no shrinking violet.

Her independence was evident in the interchanges she had with her mother during her statement. The first time her mother spoke during the statement, after defendant had already told the particulars of the homicide, Convery was attempting—without success—to gather information about others who were with defendant on the night of the shooting:

> [DEFENDANT'S MOTHER]: Can I?
>
> DETECTIVE CONVERY: Yeah, go ahead.
>
> [DEFENDANT'S MOTHER]: [Defendant], all this, for one, you're going to come home to mommy. You're going to get into protective custody.
>
> [DEFENDANT]: I'm not going in no protective custody. I broke the law. (Inaudible)
>
> [DEFENDANT'S MOTHER]: No, we're going into a house, a house far away and nobody gonna know where.

19

A-0984-18

[DEFENDANT]: I'm not doing all that. That's just movie stuff. I'm not doing all that.

[DEFENDANT'S MOTHER]: I don't think that you did this.

[DEFENDANT]: You're going to think all you want. I know what I did.

Defendant's exchange with her mother after the detectives had finished questioning further manifests that defendant was not swayed by any of her mother's comments:

DETECTIVE CONVERY: Okay. Put down your initials and the date and time. And the time's going to be 1:25. Do you have any questions before we leave?

[DEFENDANT'S MOTHER]: I don't know what to say. I just know that I love you with all the life in me. You do have a heart, [defendant]. You are on medication. You do have a diagnosis.

[DEFENDANT]: (Inaudible) medication stuff like—

[DEFENDANT'S MOTHER]: Yeah but you told me different—

[DEFENDANT]: No, I'm not. I'm just saying that I just don't, I don't want to be home.

[DEFENDANT'S MOTHER]: Because you don't want to take it.

[DEFENDANT]: Yeah. What's the point of taking medicine for no reason, just so I can feel all sleepy and what[]not.

20

[DEFENDANT'S MOTHER]:  No, [defendant].

[DEFENDANT]:  But I don't need medicine.  I never did need medicine.  Just 'cause last year I got locked up for (inaudible), just 'cause of that they wanted me to take medicine.

[DEFENDANT'S MOTHER]:  You understand you don't have to make marks on your—

[DEFENDANT]:  Understand, cut, same thing, cut with a knife.

[DEFENDANT'S MOTHER]:  Okay, and you was not on medicine then.  (Inaudible)  The point is this is not you, this is not you at all.  I'm not accepting it.  My higher power ain't accepting it.  It's going to be a change around.

[DEFENDANT]:  I told you what I wanted to do.  Ever[] since I mentioned it, what did you want me to say when I said, when I always said, mom I want a gun.  (Inaudible).

[DEFENDANT'S MOTHER]:  What happened to, mommy, I want to go in the Army?

[DEFENDANT]:  Because of the gun.

[DEFENDANT'S MOTHER]:  No.  What happened to, mommy, I want to be a cheerleader?

[DEFENDANT]:  That's all out the window.

[DEFENDANT'S MOTHER]:  Why does it have to be out the window?  What happened to mommy, I want to be a poet, I want to write books.

21

[DEFENDANT]:  I'm done talking.

[DEFENDANT'S MOTHER]:  You don't want to hear that stuff?

[DEFENDANT]:  Nope.

[DEFENDANT'S MOTHER]:  What happened to, mommy, I'm going to make it, I'm going to be somebody.

[DEFENDANT]:  I never said that.

[DEFENDANT'S MOTHER]:  You never said that, [defendant]?

DETECTIVE GONZALES:  What grade are you in now?  When you was in school, what grade were you in?

[DEFENDANT]:  Tenth.

DETECTIVE GONZALES:  Tenth grade?

[DEFENDANT'S MOTHER]:  A student.  Why are you turning everything negative[?]

[DEFENDANT]:  'Cause nothing is positive.

[DEFENDANT'S MOTHER]:  It is positive.

Those exchanges also refute defendant's argument that her mother

was physically present at the interrogation but was not acting as the buffer between the police and the juvenile that a parent is expected to be.  In fact, she acted in the complete opposite, telling defendant she would be coming home with mommy, and would be going to a

22

new house in protective custody, and that the police were there to help her.

As stated, defendant had already confessed by the time her mother said anything and defendant did not at all agree with her mother's statements.

Moreover, defendant's mother never told her the police were there to help her. She did not, as defendant contends in her merits brief, reiterate Convery's "indication [to the mother prior to the statement's commencement] that he was attempting to help" defendant. This was not the case, as in A.S., where police had the juvenile's adoptive mother "read A.S. her rights, a procedure which tainted the interview from its outset and must not be utilized in the future." Id. at 137, 149. A.S. is also inapposite because Convery reviewed each of defendant's rights with her and her mother, even adding some explanation to the printed material, emphasizing "we can talk and if you don't feel comfortable[,] we can stop at any time," and later reiterating "you can stop me at any time." And, again, defendant was not like A.S.: an unsophisticated fourteen-year-old juvenile.

Of course, "the parent's role as a 'highly significant factor' in the totality of the circumstances analysis used to assess whether a juvenile's confession was knowing, intelligent, and voluntary," Id. at 147 (quoting Presha, 163 N.J. at 315), and "courts should give that factor added weight when balancing it against

23

all other factors," Presha, 163 N.J. at 315; see also A.S., 203 N.J. at 147. The Court explained "[t]he role of a parent in the context of a juvenile interrogation takes on special significance," because "[i]n that circumstance, the parent serves as advisor to the juvenile, [and as] someone who can offer a measure of support in the unfamiliar setting of the police station." Presha, 163 N.J. at 314. The Court particularly explained "[w]hen younger offenders are in custody, the parent serves as a buffer between the juvenile, who is entitled to certain protections, and the police, whose investigative function brings the officers necessarily in conflict with the juvenile's legal interests." Id. at 315. The Court held a parent's "mere presence" did not provide the buffer expected by the Court. A.S., 203 at 148. "In order to serve as a buffer, the parent must be acting with the interests of the juvenile in mind." Ibid.

The record belies defendant's contention that her mother worked against her during the statement. The mother expressed caring concern for defendant—albeit, at times, laced with fanciful wishes, ones that defendant knew were just that. So the detective's failure to correct the mother's statements had no impact on defendant, who had already confessed. The facts of this case are not analogous to those in A.S., where the parent replied to A.S.'s question whether she had to talk if she had a lawyer: "[Y]ou . . . have to talk"; "[Y]ou . . . have

24

to answer," 203 N.J. at 139, and harangued the fourteen-year-old to answer the detective's questions notwithstanding A.S.'s "imperfect, child-like efforts to assert her right to" remain silent, id. at 136. Defendant's mother never urged her to confess, and her words did not engender defendant's confession; defendant's mother did not "provide the police with an assistant." See id. at 137.

We discern that, although Convery advised defendant of her rights in her mother's presence, he did not follow the Court's instruction to "then let the parent and child consult in private" to afford the mother "a meaningful opportunity to help [defendant] understand [her] rights and decide to waive them." A.A., 240 N.J. at 345. To be sure, that practice should have been followed. But we note the detectives did not prevent consultation between defendant and her mother. Defendant said she understood each of the rights and both defendant and her mother read the waiver portion aloud before agreeing to its terms. Thereafter, Convery confirmed that defendant's mother wanted to remain present during the statement.

"If law enforcement officers do not allow a parent and juvenile to consult in private, absent a compelling reason, that fact should weigh heavily in the totality of the circumstances to determine whether the juvenile's waiver and statements were voluntary." Id. at 359. That heavy weight is lightened here.

Defendant was a savvy sixteen-year-old, experienced with law enforcement and the streets, who fully understood her rights. She showed unwillingness to listen to her mother. And neither defendant nor her mother impliedly or overtly expressed any desire to talk after Convery administered defendant's rights. This was not the case where the detectives did "not allow a parent and juvenile to consult in private." Ibid.

We deem the balance of defendant's suppression-related arguments, including that police did not provide defendant with the assistance of her grandmother—her legal guardian—and instead selected defendant's mother as her buffer during the statement even though the mother's parental rights had been terminated, to be without sufficient merit to warrant discussion. R. 2:11-3(e)(2). A close review of the record reveals that Convery called the number Wolf provided for the grandmother, and defendant's mother answered the phone. Any attempted contact by Convery always resulted in interactions with the mother; there is no evidence he ever met or talked with the grandmother. Indeed, at the start of the statement, Convery recited the statement was being taken "[i]n the presence of her mother, Ms. [Doe[4]]." He then asked, "Is it Eda [Doe]?"

[4] For both the mother and grandmother, we use a fictitious surname for the one they shared.

A-0984-18

Defendant's mother corrected, "Tawanna [Doe]." That Convery thought defendant's mother was the same person for whom Wolf gave Convery the contact information is evidenced by his subsequent statement to defendant: "You were reported missing. Your mother reported you missing." Convery did not circumvent defendant's legal guardian, her grandmother, in selecting her mother to be present during the statement. Indeed, defendant never asked for her grandmother or protested her mother's presence.

Defendant's arguments for suppression of her statement also ignore the totality of the circumstances. The trial judge also considered other factors that militated against suppression: defendant had prior experience with police questioning, having been involved in multiple juvenile proceedings; the length of detention—"about an hour and five minutes starting at 12:25 p.m."; the lack of evidence of physical punishment or mental exhaustion as "defendant appeared generally alert during the interrogation" and "gave responsive answers to the questions without any particular delays."

The circumstances under which defendant's statement was taken were not perfect. But the totality of the circumstances demonstrate that the State met its burden of proving beyond a reasonable doubt defendant's waiver of her privilege against incrimination was knowing, intelligent and voluntary. See A.S., 203

A-0984-18

N.J. at 148. The trial judge did not err in denying her motion to suppress the recorded statement.

II

Defendant also argues the assistant prosecutor's comments about the trajectory taken by the bullet that struck the victim were not based on the evidence and had the "clear capacity to have led to an unjust verdict," see State v. Frost, 158 N.J. 76, 88-89 (1999), thus warranting a new trial. Defendant specifies the portion of the State's summation where the assistant prosecutor countered defendant's trial testimony that a person known as "Scrap" shot the victim and threatened her if she disclosed his culpability:

> And then, lastly, the medical examination. This is a key point. Back to front; right to left, slightly upwards. She's 5'4". Tyrell, Savage—whatever you want to call him—Scrap, big dudes, tall, at least 5'10". She told you that. She told you that. She told you she was 5'4". When you put a gun that close to the back of somebody's head, if you're 5'10" or above, that's down on Vinny, who his mother . . . said was approximately 5'5", 5'6". That's down, that's not slightly upwards. She's shorter than Vinny. If she's going to put a gun to the back of his head that pathway is going to be slightly upwards.

Defendant claims the State's failure to call any expert, including the medical examiner or a ballistics expert, "to opine on the likely path a bullet would travel

28

given the relative heights of a shooter and a victim" rendered the assistant prosecutor's remarks extrinsic to the evidence.

Our Supreme Court recently reiterated the standards to which we hold the State's lawyer when summing to a jury:

> While "prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries" and are "afforded considerable leeway," "their comments [should be] reasonably related to the scope of the evidence presented." [Id.] at 82. "[R]eferences to matters extraneous to the evidence" may constitute prosecutorial misconduct. State v. Jackson, 211 N.J. 394, 408 (2012). "In other words, as long as the prosecutor 'stays within the evidence and the legitimate inferences therefrom,'" [State v. McNeil-Thomas, 238 N.J. 256, 275 (2019)] (quoting State v. R.B., 183 N.J. 308, 330 (2005)), "[t]here is no error," ibid. (quoting State v. Carter, 91 N.J. 86, 125 (1982)).
>
> [State v. Williams, ___ N.J. ___, ___ (2021) (slip op. at 14).]

The assistant prosecutor did not stray from the Court's strictures. The trial record shows the parties stipulated that, had the medical examiner testified, he would have stated the victim sustained "a gunshot wound to the back of [his] head[,] . . . located approximately two inches above and three inches posterior to the right ear canal[;]" and "the overall pathway of the projectile was back to front, right to left, and slightly upward."

29

In her statement, defendant told the detectives that as she walked with the victim and he stopped and slowed down, she told him "you all behind me walking, can you walk ahead of me." She said she stopped and acted like she was tying her shoe then shot him in the back of the head at close range.

During the trial, the victim's mother testified he was approximately 5'6" tall. In her statement to the detectives, defendant said she was 5'4". Convery testified he identified Scrap as Zihere Sabre whom he met and ascertained Scrap was Convery's height—approximately 5'10"—or "maybe actually about an inch taller."

The assistant prosecutor did nothing more than link the stipulated fact that the projectile's path was "slightly upwards" to the relative heights of defendant, Scrap and the victim, proposing that the path indicated it was fired from defendant who was shorter than both the victim and Scrap. Although the height and angle of the gun could have been adjusted no matter the height of the shooter, those facts and conclusions did not require expert testimony as the subject was not beyond the ken of an ordinary juror. As the trial judge said in his oral decision denying defendant's motion for a new trial, "[t]his is really layperson physics and geometry. No expert is needed to understand a simple argument about how a bullet would travel given the position of the gun relative

A-0984-18

to the position of the shooting victim at the time the shot was fired." We wholly agree, considering that the inference the assistant prosecutor was asking the jury to draw related only to the source of the upward path of the fired bullet, a path established by the medical examiner's stipulated finding.

As the trial judge instructed the jury in conformance with the model jury charge,

> circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn.

> An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence. Whether or not inferences should be drawn is for you to decide using your own common sense, knowledge and every day experience. Ask yourselves is it probable, logical and reasonable.

> [Model Jury Charges (Criminal), "Criminal Final Charge" (rev. May 12, 2014).]

The jury was free to make the inference based on the evidence presented even if the assistant prosecutor said nothing of the issue. Defendant had the same opportunity to argue the factual evidence supported a divergent finding.

Indeed, defendant posed no objection to the assistant prosecutor's comments. Although, in the absence of an objection, we generally apply the plain error standard and will not reverse unless the error was "of such a nature

A-0984-18

as to have been clearly capable of producing an unjust result," R. 2:10-2, we need not decide whether, in the context of this jury trial, relief need be afforded because the possibility of an unjust result is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached," State v. Macon, 57 N.J. 325, 336 (1971). The assistant prosecutor committed no error, much less plain error, by his evidence-based comments.

Thus, there is no need to further analyze and

> weigh "the severity of the misconduct and its prejudicial effect on [defendant's] right to a fair trial," State v. Wakefield, 190 N.J. 397, 437 (2007), and reverse a conviction on the basis of prosecutorial misconduct only if "the conduct was so egregious as to deprive defendant of a fair trial," ibid. (quoting State v. Papasavvas, 163 N.J. 565, 625 (2000)).
>
> [Williams, ___ N.J. at ___ (slip op. at 14).]

### III

Defendant advances a single argument regarding the trial judge's denial of her motion for a new trial: a new trial was warranted because "[a]fter the verdict . . . defendant recalled that she told a friend named Wayne Roberts on the day of the shooting that 'Scrap' was the shooter and had threatened . . . defendant." The judge considered Roberts's witness statement under the "stringent" test to which newly discovered evidence is put in determining a new-trial motion: "the

32

new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted." State v. Carter, 85 N.J. 300, 314 (1981). A defendant must satisfy all three prongs to be entitled to a new trial. State v. Ways, 180 N.J. 171, 187 (2004).

Concluding defendant met the first prong, the trial judge found "the alleged conversation between . . . defendant and . . . Roberts is arguably material because it tends to show that she was not the real shooter and that she was merely taking the fall for someone else." Although the judge deemed the evidence "largely cumulative" of defendant's trial testimony "since it essentially constitutes her telling another person the same thing at an earlier time," the judge noted the evidence "also cuts against the [S]tate's implied argument of recent fabrication given that the statement actually was made, according to . . . defendant, shortly after the incident."

Turning to the third prong, the judge gave the evidence "moderate weight" because, "if believed, it would bolster . . . defendant's recantation and denial of guilt that she testified to at trial." The judge discerned that the "exceedingly unreliable nature of recantation testimony" and Roberts's probable impeachment

with his criminal history, it was "not probable that this new evidence would change the jury's verdict[.]" The judge also determined the "evidence clearly fails" the second prong because Roberts was "incarcerated in a [S]tate correctional facility at the time of trial" and was accessible to defendant.

The trial judge's comprehensive and cogent findings well support his analysis of the three pertinent prongs, and we perceive no abuse, much less a clear abuse, of his sound discretion, see State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000), that "arises on demonstration of manifest error or injustice[,]" Hisenaj v. Kuehner, 194 N.J. 6, 20 (2008) (citation and internal quotation marks omitted); State v. Torres, 183 N.J. 554, 572 (2005), and occurs when the trial judge's "decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis,'" Jacoby v. Jacoby, 427 N.J. Super. 109, 116 (App. Div. 2012) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

The judge properly discerned evidence is considered material under prong one if it has "'some bearing on the claims being advanced' . . . [including] evidence that supports a general denial of guilt." State v. Nash, 212 N.J. 518, 549 (2013) (quoting Ways, 180 N.J. at 188). The Court in Nash recognized that "prongs one and three are inextricably intertwined." Ibid. As such,

[d]etermining whether evidence is merely cumulative, or impeaching, or contradictory, and, therefore, insufficient to justify the grant of a new trial requires an evaluation of the probable impact such evidence would have on a jury verdict. Therefore, the focus properly turns to prong three of the Carter test, whether the evidence is of the sort that would probably change the jury's verdict if a new trial were granted. The characterization of evidence as merely cumulative, or impeaching, or contradictory is a judgment that such evidence is not of great significance and would probably not alter the outcome of a verdict. However, evidence that would have the probable effect of raising a reasonable doubt as to the defendant's guilt would not be considered merely cumulative, impeaching, or contradictory.

[Ways, 180 N.J. at 188-89 (citations and internal quotation marks omitted).]

Under both of these prongs, the "central issue" is whether the newly discovered evidence has the power to "shake the very foundation of the State's case and almost certainly alter the earlier jury verdict." Nash, 212 N.J. at 549 (quoting Ways, 180 N.J. at 189, 191).

The second prong "recognizes that judgments must be accorded a degree of finality and, therefore, requires that the new evidence must have been discovered after completion of trial and must not have been discoverable earlier through the exercise of reasonable diligence." Ways, 180 N.J. at 192.

The trial judge's denial of the new-trial motion adhered to our holding that, when considering a motion for a new trial under Rule 3:20-1, a judge "shall not set aside a jury verdict unless 'it clearly and convincingly appears that there was a manifest denial of justice under the law.'" State v. Armour, 446 N.J. Super. 295, 305-06 (App. Div. 2016). There is no reason to disturb the judge's sound decision. See Russo, 333 N.J. Super. at 137.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0984-18