**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2052-20

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

ALLEN M. ESSNER, a/k/a
ALLEN ESSNER,

     Defendant-Appellant.

_____

Submitted September 20, 2022 – Decided October 13, 2022

Before Judges Geiger and Susswein.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 97-11-1245.

Joseph E. Krakora, Public Defender, attorney for appellant (Stefan Van Jura, Assistant Deputy Public Defender, of counsel and on the brief).

Robert J. Carroll, Morris County Prosecutor, attorney for respondent (Tiffany M. Russo, Assistant Prosecutor, on the brief).

PER CURIAM

Defendant Allen Essner appeals from a March 1, 2021 Law Division order denying his motion for either a new trial or resentencing based on newly discovered evidence. In 1999, defendant was convicted by a jury for the murder of his affair partner's husband. Defendant was twenty-six years, ten months old at the time of the homicide in 1997. The gravamen of his trial defense was that the shooting was accidental. He now contends that scientific studies pertaining to the development of the adolescent brain constitute newly discovered evidence warranting a new trial. In the alternative, he argues that he is entitled to resentencing pursuant to Rule 3:21-10(b) based on scientific research that shows, among other things, that juveniles are more amenable to rehabilitation than adults. Judge Stephen J. Taylor denied defendant's motion, rendering a thirteen-page written opinion. We affirm substantially for the reasons explained in Judge Taylor's cogent and comprehensive opinion.

I.

We discern the following facts and procedural history from the record.[1] This case arises from the July 1997 killing of Antonio Messina. Defendant and

---

[1] The pertinent facts concerning the murder are thoroughly recounted in our November 22, 2002 direct appeal opinion and need not be repeated at length in

Antonio became friends while taking classes at Lincoln Technical School in 1996. Antonio was married and introduced defendant to his wife, Kathleen. In the summer of 1996, defendant and Kathleen began an extramarital affair. In October 1996, Antonio became aware of the affair, which resulted in several altercations between Antonio and defendant. Despite the discord, defendant and Kathleen continued an on-and-off affair until the summer of 1997.

On July 3, 1997, Kathleen ended the affair and told defendant that she was returning to her husband. Two days later, defendant went to the Messinas' home, peered through a downstairs window, and overheard the couple talking. The Messinas then proceeded upstairs, and defendant presumed they were going to be intimate. Upset by what he saw, defendant left and drove to his grandmother's home approximately sixty miles away. He returned to the Messinas' home in the early morning hours armed with a shotgun. Defendant waited outside to confront Antonio when he left for work. When Antonio exited his home, defendant approached him with his finger on the trigger of the shotgun. During the confrontation, Antonio was shot in the head with a shotgun blast and died.

---

this opinion. <u>See</u> <u>State v. Essner</u>, No. A-2498-99 (App. Div. Nov. 22, 2002) (slip op. at 2–9).

Defendant fled the scene and was later arrested by police following a brief investigation. After being given Miranda[2] warnings and signing a waiver form, defendant was questioned by police and confessed to shooting Antonio, although he claimed the shooting was accidental. In his statement, defendant claimed he only wanted to talk to Antonio and brought the gun to avoid getting into a fight. Defendant was born on September 4, 1970, making him twenty-six years and ten months old at the time of the shooting.

Defendant was charged by indictment with knowing or purposeful murder, N.J.S.A. 2C:11-3, and possession of a shotgun for an unlawful purpose, N.J.S.A. 2C:39-4(a). He was tried before a jury in October 1999 and found guilty of both charges. The trial judge sentenced defendant to a fifty-year term of imprisonment, subject to the eighty-five percent period of parole ineligibility prescribed by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

In 2001, the Supreme Court held that the original version of NERA—which was in effect when defendant committed the homicide—did not apply to the crime of murder. State v. Manzie, 168 N.J. 113 (2001). On direct appeal, we affirmed defendant's convictions but remanded for resentencing to replace

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

the NERA period of parole ineligibility with that prescribed by N.J.S.A. 2C:11-3(b)(1).  State v. Essner, No. A-2498-99 (App. Div. Nov. 22, 2002) (slip op. at 15), certif. denied, State v. Essner, 175 N.J. 547 (2003).  In December 2002, defendant was resentenced to a fifty-year term of imprisonment with a thirty-year period of parole ineligibility as required by N.J.S.A. 2C:11-3(b)(1).[3]

Defendant thereafter filed a petition for post-conviction relief (PCR), which was denied.  In February 2009, we affirmed the denial of defendant's PCR, State v. Essner, No. A-3354-06 (App. Div. Feb. 2, 2009) (slip op. at 7), and the Supreme Court denied certification, State v. Essner, 199 N.J. 541 (2009).

On August 20, 2019, defendant filed a pro se brief seeking a new trial based on newly discovered evidence.  In October 2020, defendant was appointed counsel to represent him in the new trial motion litigation.  Judge Taylor convened oral argument on defendant's motion on February 26, 2021.  On March

---

[3]  N.J.S.A. 2C:11-3(b)(1) provides:

> Murder is a crime of the first degree but a person convicted of murder shall be sentenced . . . by the court to a term of [thirty] years, during which the person shall not be eligible for parole, or be sentenced to a specific term of years which shall be between [thirty] years and life imprisonment of which the person shall serve [thirty] years before being eligible for parole.

1, 2021, the judge issued an order and accompanying written opinion denying the motion.

This appeal follows.[4] Defendant raises the following contentions for our consideration:

> POINT I
>
> DEFENDANT IS ENTITLED TO A NEW TRIAL BECAUSE MATERIAL, NEWLY DISCOVERED EVIDENCE WOULD PROBABLY HAVE CHANGED THE JURY'S VERDICT.
>
> POINT II
>
> THE COURT ERRED IN DENYING DEFENDANT'S MOTION FOR RE-SENTENCING BECAUSE THE 50-YEAR SENTENCE IMPOSED ON THIS YOUTHFUL DEFENDANT, WITHOUT CONSIDERATION OF THE BEHAVIORAL SCIENCE COUNSELING AGAINST SUCH IMPOSITION, CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT. U.S. Const. Amend. VIII, XIV; N.J. Const. Art. I, Par. 12.

---

[4] This appeal originally was scheduled to be heard on a Sentence on Appeal (SOA) Calendar. We moved the matter to the plenary calendar and ordered briefing.

A-2052-20

II.

We begin our analysis by acknowledging the legal principles governing motions for a new trial.  Rule 3:20-1 provides:

> The trial judge on defendant's motion may grant the defendant a new trial if required in the interest of justice. . . . The trial judge shall not, however, set aside the verdict of the jury as against the weight of the evidence unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law.

"A motion for a new trial is addressed to the sound discretion of the trial judge, and the exercise of that discretion will not be interfered with on appeal unless a clear abuse has been shown."  State v. Russo, 333 N.J. Super. 119, 137 (App. Div. 2000).  A defendant is permitted to seek a new trial on the ground of newly discovered evidence at any time.  State v. Szemple, 247 N.J. 82, 99 (2021) (quoting R. 3:20-2).  In State v. Carter, 85 N.J. 300 (1981), the Court repeated the well-established standard for granting a new trial based on newly discovered evidence:

> [T]o qualify as newly discovered evidence entitling a party to a new trial, the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence

beforehand; and (3) of the sort that would probably change the jury's verdict if a new trial were granted.

[Carter, 85 N.J. at 314.]

"All three tests must be met before the evidence can be said to justify a new trial." Ibid. (citing State v. Johnson, 34 N.J. 212, 222 (1961)). "Under prong one of the Carter test, [courts] first must look to the issue of materiality as that term pertains to the defense in a criminal case." State v. Ways, 180 N.J. 171, 188 (2004) (citing Carter, 85 N.J. at 314). "Material evidence is any evidence that would 'have some bearing on the claims being advanced.'" Ibid. (quoting State v. Henries, 306 N.J. Super. 512, 531 (App. Div. 1991)).

"Determining whether evidence is 'merely cumulative, or impeaching, or contradictory,' and, therefore, insufficient to justify the grant of a new trial requires an evaluation of the probable impact such evidence would have on a jury verdict." Ways, 180 N.J. at 188–89. "The characterization of evidence as 'merely cumulative, or impeaching, or contradictory' is a judgment that such evidence is not of great significance and would probably not alter the outcome of a verdict." Id. at 189. "However, evidence that would have the probable effect of raising a reasonable doubt as to the defendant's guilt would not be considered merely cumulative, impeaching, or contradictory." Ibid. (citing

Henries, 306 N.J. Super. at 535). See also State v. Nash, 212 N.J. 518, 549 (2013).

The second prong of the Carter test "recognizes that judgments must be accorded a degree of finality and, therefore, requires that the new evidence must have been discovered after completion of trial and must not have been discoverable earlier through the exercise of reasonable diligence." Ways, 180 N.J. at 192 (citing Carter, 85 N.J. at 314). Importantly, for purposes of this appeal, a defendant may seek a new trial where advances in scientific methodology previously unavailable would probably have changed the result. See State v. Behn, 375 N.J. Super 409, 429 (App. Div. 2005).

We next apply these general principles to the record before us. Defendant points to behavioral and neurological science studies that show that the prefrontal cortex, required for impulse-control and self-control in high stress situations, does not finish developing until a person is in their mid-twenties. Defendant argues that, had the jury been privy to these studies, it probably would have concluded that he was incapable of forming the prescribed culpability requirement for knowing or purposeful murder and, therefore, would probably have found him innocent of that first-degree crime.

9

Judge Taylor rejected that contention, finding that "the purportedly newly discovered evidence advanced by defendant fails to meet the three-prong test established in Carter." Specifically, the judge found that the studies defendant offered as newly discovered evidence are neither "novel" nor "a scientific methodology previously unavailable." Judge Taylor pointed out that, "[s]tatutes, court rules and evidence rules have long recognized that an individual accused of murder can produce evidence that his mental state at the time of the killing was such that he could not form the requisite intent." He also noted that, at the time of the defendant's trial, the U.S. Supreme Court had recognized the "broad agreement that adolescents as a class are less mature and responsible than adults" in Thompson v. Oklahoma, 487 U.S. 815, 834 (1988). As a result, Judge Taylor reasoned that defendant could have introduced evidence of his immaturity at the time of his trial, but instead mounted a defense based on a theory of accidental discharge.

Importantly, Judge Taylor, while recognizing that "the science of adolescent brain development may have progressed," pointed out that defendant did not introduce evidence indicating "that this new science impacts [him] in any fashion, since he was [twenty-six] years and [ten] months old at the time of

10

the murder with significant life experiences." Judge Taylor emphasized that "[b]y any definition, [defendant] was not an adolescent at the time of the murder." The judge also noted that defendant offers no evidence linking the scientific studies on general adolescent behavior to his own capacity to form the culpability required to commit a murder.

Relatedly, Judge Taylor found that the scientific evidence defendant offered was not material to an issue contested at trial, noting that the trial defense was based on a claim of accident. Judge Taylor reasoned that the scientific studies would have little bearing on whether the shooting was accidental. With respect to the third prong of the Carter test, Judge Taylor found that "defendant has presented no evidence that the developments in behavioral science would probably change the jury's verdict if a new trial were granted."

We acknowledge, as did Judge Taylor, that advances in scientific knowledge may constitute newly discovered evidence for purposes of a new trial motion, provided that a defendant can show, for example, that recently improved scientific methodology, not available at the time of trial, would probably have changed the result. See Behn, 375 N.J. Super. at 429 (citing State v. Halsey, 329 N.J. Super. 553, 559 (App. Div. 2000)). The evidence offered as newly

11

discovered evidence in <u>Behn</u>, however, is readily distinguishable from the neuroscience studies that defendant proffers.

In <u>Behn</u>, the newly discovered evidence consisted of an affidavit from a qualified expert witness whose studies on composition bullet lead analysis "called into question, if not totally undermined" scientific assumptions fundamental to the State's case. <u>Id.</u> at 430. Because the new scientific evidence would have effectively neutralized the State's trial expert and its entire prosecution strategy, we determined that it possessed the capacity to change the jury's verdict. <u>Ibid.</u>

Here, in stark contrast, the behavioral science studies that defendant offers in support of his motion have little bearing on the material issue that was disputed at trial, namely, whether the shooting was accidental. As Judge Taylor aptly noted, "[e]ven if defendant altered his defense and argued he lacked the requisite intent for murder, there is no evidence linking the general behavior science to defendant's lack of ability to form the requisite intent to kill."[5]

---

[5] We note that the State was not required at trial to prove that defendant had an intent to kill. In a prosecution for murder under N.J.S.A. 2C:11-3(a), the State need only prove that defendant acted knowingly. <u>See also</u> N.J.S.A. 2C:2-2(b) (defining the four kinds of culpability used in the New Jersey Code of Criminal

Judge Taylor amplified that finding while addressing the third prong of the <u>Carter</u> test, carefully applying the legal test to the relevant facts in this case. The judge explained:

> [I]t is doubtful a jury would find the science even applied to defendant, given his age, life experiences and the circumstances of the case. The studies are focused on adolescents, and even if that term were extended to individuals in their early twenties, defendant falls well outside that parameter. Even if the defendant were to present expert testimony regarding his lack of brain development, the facts of the case would not change. The defendant, married with two children, was having an affair with the victim's wife and surreptitiously spied on the couple through a window late at night. When the defendant saw the couple retreat to a bedroom and heard the sound of lovemaking, he left, armed himself with a shotgun and returned to the premises hours later at 5:00 a.m. Defendant then laid in wait for the victim to leave for work and confronted the victim when he exited the home. The victim was shot from approximately [six] feet away, according to forensic evidence and testimony, and defendant fled the scene immediately after the shooting. Although the trial court instructed the jury on the lesser offenses of passion-provocation manslaughter, aggravated manslaughter and reckless manslaughter, the jury rejected those alternatives and convicted defendant [of] murder.

Justice, N.J.S.A. 2C:1-1 to -104-9, and distinguishing "purposely," N.J.S.A. 2C:2-2(b)(1), from "knowingly," N.J.S.A. 2C:2-2(b)(2)).

A-2052-20

We agree with Judge Taylor that on these facts—especially considering that defendant was almost twenty-seven years old at the time of the shooting—defendant failed to establish that, if a new trial were granted, the verdict would probably be different if the jury were to be apprised of scientific studies pertaining to the development of the adolescent brain.

III.

We turn next to defendant's alternate contentions that the neuroscience studies warrant a reduction in his sentence and that the failure to account for those studies constitutes cruel and unusual punishment. We first acknowledge that a defendant may challenge an illegal sentence at any time. State v. Acevedo, 205 N.J. 40, 47 n.4 (2011) (citing R. 3:21-10(b)(5)). "[A]n 'illegal sentence' is one . . . 'not imposed in accordance with law.'" Id. at 45 (quoting State v. Murray, 162 N.J. 240, 247 (2000)). That includes a sentence "imposed without regard to some constitutional safeguard." State v. Taveres, 286 N.J. Super. 610, 618 (App. Div. 1996).

Here, it cannot reasonably be disputed that defendant's sentence was imposed in accordance with law in force at the time of the sentencing proceeding. Indeed, the thirty-year minimum period of parole ineligibility is

mandatory.  See supra note 3.  We thus turn our attention to defendant's contention that the sentence imposed in 1999 has since become unconstitutional in light of the neuroscience studies showing that the human brain continues to develop well into an individual's twenties.

Defendant's argument relies on a series of United States and New Jersey Supreme Court decisions that dealt with juvenile offenders who were tried and sentenced as adults.  He asks us to extrapolate from those cases a new rule that would render unconstitutional the mandatory sentence of thirty years without parole when imposed upon a person who was an adult when he committed murder, in this case, one that was almost twenty-seven years old.  We decline to make that leap.

In Miller v. Alabama, the United States Supreme Court held that the mandatory life-without-parole sentence imposed on Miller—who was fourteen years old when he committed murder—constitutes cruel and unusual punishment.  567 U.S. 460, 465 (2012).  The Court reasoned that "children are constitutionally different from adults for purpose of sentencing" because they "have diminished culpability and greater prospects for reform," and thus are "less deserving of the most severe punishments."  Id. at 471 (quoting Graham v.

15

<u>Florida</u>, 560 U.S. 48, 68 (2010)). The Court stressed that sentencing courts must consider "how children are different, and how those differences counsel against irrevocably sentencing them to [a] lifetime in prison." <u>Id.</u> at 481. Even so, the Court did not categorically bar juveniles from being sentenced to life without parole. <u>Id.</u> at 480. Rather, the Court instructed sentencing courts to take into consideration the "hallmark features" of youth, the nature of the juvenile's environment, the effect of youthful "incompetencies" on criminal proceedings, and the "possibility of rehabilitation." <u>Id.</u> at 477–78 (citations omitted).

In <u>State v. Zuber</u>, our Supreme Court built upon this federal juvenile sentencing jurisprudence and extended application of the <u>Miller</u> principles to situations where a juvenile is facing a term of imprisonment that is the "practical equivalent to life without parole."[6] 227 N.J. 422, 429–30 (2017). However, as the Court recently made clear in <u>State v. Ryan</u>, it did not extend <u>Miller</u>'s

---

[6] We agree with Judge Taylor that the sentence imposed in this case, while substantial, is not the "practical equivalent" of life without parole. In <u>Zuber</u>, under the aggregate sentence, Ricky Zuber would have been about seventy-two years old when he became eligible for parole; the defendant in the consolidated case, James Comer, would have been eighty-five years old. 227 N.J. at 428. In the matter before us, defendant will be eligible for parole in July 2027, when he will be fifty-six years old.

protections to defendants sentenced for crimes committed when those defendants were over the age of eighteen. 249 N.J. 581, 596 (2022).

We likewise reject defendant's invitation to extend Miller and its progeny even further to encompass persons who were older than twenty-five years old when they committed their crimes.[7] We add this is not a case where the crime was committed by a person who had just turned eighteen. Defendant at the time of the fatal encounter had been an adult for purposes of our criminal justice system for nearly nine years.

Finally, we note that in 2020, the Legislature amended N.J.S.A. 2C:44-1 to add mitigating factor fourteen. "N.J.S.A. 2C:44-1(b) now provides that a sentencing judge 'may properly consider' that '[t]he defendant was under [twenty-six] years of age at the time of the commission of the offense.'" State v. Lane, 251 N.J. 84, 93 (2022). The new sentencing provision is based upon a recommendation contained in the first annual report of the New Jersey Criminal

---

[7] We note that N.J.S.A. 2C:43-5 provides an indeterminant sentencing option to be served at the Youth Correctional Institution Complex for certain "young adult offenders" who have not been convicted of certain crimes that carry a mandatory minimum term of parole ineligibility, such as murder. That provision applies to persons who "at the time of sentencing, [are] less than [twenty-six] years of age."

Sentencing Disposition Commission (CSDC).[8]  Ibid.  Defendant would not qualify for this mitigating factor because he was twenty-six and ten months old when he committed the murder.  We deem it significant that neither the CSDC nor the Legislature extended the youth mitigation principle to persons as old as defendant was when he committed the murder.  We also deem it to be significant that our Supreme Court construed the new mitigating factor to be prospective only.  Id. at 95–97.  Nothing in Lane suggests that failure to apply the youth mitigating factor retroactively would somehow constitute an Eighth Amendment violation.

To the extent we have not addressed them, any remaining arguments raised by defendant lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

---

[8]  The CSDC Report incorporated two of the studies cited to by defendant, one published in 1992—which was available to him at the time of his trial—and the other in 2003.  See N.J. CRIM. SENT'G & DISPOSITION COMM'N, ANNUAL REPORT (Nov. 2019).  The report noted that "with the advancement of modern brain science has come the recognition that juveniles possess certain traits that differentiate them from their adult counterparts."  Id. at 27.  The report recommended the creation of a new mitigating sentencing factor for youth, remarking that "[a]lthough these differences do not altogether absolve juveniles of responsibility for their crimes, it is widely accepted that they may reduce their culpability."  Ibid.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

19