**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3365-22

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

NAEEM MILLER,

    Defendant- Respondent.

_____

Submitted February 27, 2024 – Decided April 3, 2024

Before Judges Natali and Puglisi.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 03-05-1830.

Theodore N. Stephens, II, Essex County Prosecutor, attorney for appellant (Lucille M. Rosano, Assistant Prosecutor, of counsel and on the briefs).

Freeman & Patel LLC, attorneys for respondent (Jarred S. Freeman, on the brief).

PER CURIAM

By leave granted, the State appeals from the Law Division's June 1, 2023 order vacating defendant Naeem Miller's May 13, 2005 judgment of conviction and granting a new trial. Having reviewed the State's contentions and the record in light of the applicable standard of review, we affirm.

I.

In March 2003, a grand jury returned an indictment charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a); second-degree aggravated assault, N.J.S.A. 2C:12-1(b); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a).

We glean the following salient facts from our decision affirming defendant's conviction, State v. Miller, No. A-6464-04 (App. Div. Jan. 8, 2007) (slip op. at 3-5), and our review of the record. In the early morning hours of December 16, 2001, an individual fired a gun outside a bar in Newark, injuring Stacy Davis and killing Timothy Phillips. Timothy[1] had gone to the bar with his brother, Kevin. Around 2:00 a.m., Kevin and another individual engaged in a physical altercation, which left Kevin with a bloody nose and mouth. When

---

[1] Because Timothy and Kevin share the same last name, we refer to them by their first names. No disrespect is intended.

Timothy saw Kevin's injuries, he exited the bar and began questioning the crowd outside in an effort to learn who had assaulted his brother in order to fight that individual.

Kevin exited the bar around the same time and knelt next to a car parked on the street, collecting himself. When he looked up, he saw Timothy standing in front of a car in the street and heard five to seven shots coming from across the street. Kevin saw a man who "slid on top of [his] brother and shot some more times." He did not see the shooter's face and could not identify him; he only saw the man "from the waist down" and described him as having a "small build, slim . . . silhouette." Kevin did not see anyone else with a gun that night.

After the shots were fired, Kevin went to Timothy, who was unconscious on the ground, then left the scene to get his mother and younger brother. Timothy was taken by ambulance but died on the way to the hospital.

Davis was friends with Timothy. He did not recall what time he arrived at the bar but remembered having one beer and hearing a fight break out near the front of the bar at closing time. He was standing by the back door and did not see the fight or know who was involved.

Davis exited the front door onto the street and saw "some dudes in the street arguing," one of which was Timothy "arguing with this kid." Davis

walked onto the sidewalk, "got about three steps down and fell on the ground . . . a couple of feet away from the door." He did not hear any gun shots, only "people arguing, [and a] bunch of noise" that he considered "regular." Davis then realized he had been shot and crawled behind a parked car.

As Davis peered out from behind the car, he saw "a dude shoot" Timothy three or four times while Timothy stood in the street. Davis was approximately twenty-seven feet away from the shooter and the streetlights provided enough light for Davis to see him. The individual who shot Timothy looked at Davis, who "looked him dead in the face," and then the shooter ran from the scene still holding the gun. Davis stayed by the car and lost sight of him. Davis had never seen the shooter before, did not know him, and described him as a "skinny dude . . . like the rest of them young kids—skinny dude, long dreads," with a "big black gun."

In the days after the shooting, detectives visited Davis in the hospital, where he was recovering from surgery. During the first two interviews, Davis was unable to identify the shooter from a photo array, one of which contained defendant. Five days after the shooting, during the third interview, Davis provided a signed statement and identified two people out of a six-person photo array. He identified the individual in photo number three, who was defendant,

4

as the shooter. He also identified the individual in photo number four as someone he had seen "out there" that night.

At trial, when Davis was asked whether he saw the shooter in court, he answered "no." The testimony continued:

> Q   Does that picture look different than the individual in court today?
>
> A   That can't be him right there.
>
> Q   I'm sorry?
>
> A   That can't be him right there.
>
> Q   And why couldn't it be him?
>
> A   Look at him.
>
> Q   Does it look different?
>
> A   That can't be him right there.
>
> Q   That doesn't look like the same individual?
>
> A   No, not at all.
>
> Q   Is there anything different about him?
>
> A   Yes, he don't [sic] look, you know—
>
> Q   Well, what's different?
>
> A   —crazy with the dirty dreads and all that.
>
> Q   He doesn't have the dreads? What else is

5

different?

A    He just—He don't [sic] look the same.

Q    He don't [sic] look the same?

A    No.

Q    Did you ever know the name of this individual?

A    Well, I don't know the kid.

Q    You never had seen him before. Did he have a beard, like the individual in court today?

A    No.

Q    Did he have close-cropped hair, like the individual in court today?

A    No.

Q    Take a look at the face in this photograph. Are you taking a look at the face in the photograph?

A    (No verbal response)

Q    Take a look at the face of that individual.

A    They don't look the same.

Q    You don't think they look the same?

A    No.

Q    Okay. But definitely the hair is different, the beard is different?

A-3365-22

A      Yes.

Q      And you did not know the name.

A      No, I did not know the kid.

Q      But this is the individual that you saw outside the bar.

A      Yes.

Because Davis's identification of defendant was equivocal, the prosecutor directed Davis to his testimony during the grand jury proceeding:

Q      Okay.  And during the course of the proceeding at the grand jury I had shown you a photograph, as a matter of fact, or asked you if you would be able to identify the photograph of the person you saw outside the bar that evening, correct?

A      Yes.

Q      Were you able to do that for the Essex County Grand Jury at that time?

A      Yes, I was.

Q      Yes, and it was the same photograph that I showed you before, was it not, with the distinctive features of that particular individual at that time.

A      Right.

Q      Same photograph.  And you did agree, did you not, in front of the grand jury that that was the individual?

A-3365-22

A    Right.

Q    Once again, the individual in court today does not look anything like that picture to you?

A    Not at all.

Q    Okay. Did you see anyone else outside that tavern that evening with a handgun? You have to answer for the—

A    No, no.

The prosecutor concluded Davis's direct testimony by inquiring into his interactions with the criminal justice system. Davis testified he was currently serving a four-year sentence for two counts of possession of a controlled dangerous substance (CDS) in a school zone, which resulted from a plea agreement that did not require him to testify in this matter. Davis also previously had been convicted of unlawful possession of a weapon in 1994, for which he was sentenced to 180 days in jail and five years' probation; robbery in 1995, for which he was sentenced to fifteen years in prison; and possession of CDS in 1996, for which he was sentenced to three years in prison.

On cross-examination, Davis said the shooter looked like other individuals he saw in the area. Davis also conceded he was in pain when he saw the shooter and was also looking at the gun for fear that it might turn on him.

Felicia Wright was also at the bar when the shooting occurred. She was

8                                                    A-3365-22

near the front door about to leave when she heard six or seven shots. She exited the bar and saw "a young man on the ground," she later learned was Timothy, whom she had known for roughly five years. Wright also saw defendant running with a "black gun." She had met defendant fifteen years prior and knew him by name because he was her daughter's father's cousin. Although she regularly saw defendant in the neighborhood, she did not "know him know him."

At trial, Wright stated she was "uncomfortable" and did not want to be there. When asked to elaborate on why she felt uncomfortable, she replied:

A    I feel like I'm like in the middle.

Q    Well, do you—

A    I know his family, I know his family. I don't—I just don't want to be here.

Q    But you did receive a subpoena to come today, right, ma'am?

A    Yes. They came and got me this morning.

Q    So your discomfort is from the fact that you know both families involved, the victim's family and the defendant's family?

A    Yes.

Q    Is that making you uncomfortable?

A    Yes.

9

Q    We've put you in an uncomfortable situation, correct?

A    Yes.

Q    Does that affect the testimony that you must give today, Ms. Wright? Ma'am, I ask you does it affect the truthfulness of the testimony that you must give today?

A    No, no.

Q    Are you going to give us the truthful testimony?

A    Yes.

Despite her discomfort, Wright continued testifying. She did not see defendant shoot anyone and only saw him running from the shooting. At that time, she was roughly forty-six feet away from him but she had no difficulty recognizing him because the streetlights were "pretty bright."

A detective visited Wright at her home about three weeks after the shooting, and while she spoke with him from her front porch, she refused to give a formal statement. The detective also showed her a photo:

Q    Now, when he showed you a photograph he was talking to you about what had happened on December 16[]—

A    Yes.

Q    —was he not?

10

A    Yes.

Q    Did you tell him who you saw that evening with a gun?

A    Uh-huh, I think.

Q    I'm sorry.  Please –

A    I think—I don't—I'm not quite sure.  I told him nothing about no gun that night.

Q    Okay.  Did he show you a picture?
A    Yes.

Q    All right.  Whose picture is that?

A    It's Naeem.

Q    Naeem Miller?

A    Yes.

At trial, Wright said defendant looked different because he had cut his hair and grown a beard after the shooting.

On cross-examination, Wright added that she left the bar fifteen seconds after the shooting and that the street had two lanes on both sides.  From across the four-lane street, she saw defendant running with an "automatic weapon." Her view was mainly of his side and back, and she could not see his clothing or whether he wore a jacket, but saw his dreadlocks.  When asked if anyone else at the bar had dreadlocks, she answered "[e]verybody . . . around there" had

11

dreadlocks.

On re-direct examination, Wright testified that when she saw the shooter, she "thought deeply" that it was defendant, whom she had seen "plenty of times" prior to the shooting. She did not wear glasses and never needed them, and she could see clearly at the time of the crime. Wright reiterated she did not want to be in court and that seeing defendant's family members made her feel "[b]ad, wrong."

On re-cross-examination, Wright said when she looked up and saw the shooter, she "said it was" defendant but had some doubt. After hearing other people name defendant as the shooter, she felt "stronger" it was him. On additional direct examination, Wright said she was "certain it was him," but then said, "I don't know. I don't—I don't know."

Twice during deliberations, the jury advised the judge it could not reach a unanimous decision and the judge instructed the jury to continue deliberating. After three days, the jury found defendant guilty on all counts. On count one, he was sentenced to thirty years with a thirty-year mandatory minimum term, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2; on count two, seven years consecutive to count one, subject to NERA; on count three, four years concurrent to count one; and count four was merged into counts one and

two.

After we affirmed the conviction and sentence, our Supreme Court denied defendant's petition for certification. State v. Miller, 190 N.J. 397 (2007). In May 2007, defendant filed a pro se petition for post-conviction relief (PCR) claiming various trial errors, prosecutorial misconduct, and ineffective assistance of trial and appellate counsel. The PCR judge denied the petition and we affirmed that order. State v. Miller, No. A-5571-07 (App. Div. Nov. 4, 2009).

In April 2010, defendant filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, again claiming ineffective assistance of counsel. Miller v. Ricci, Civil No. 10-2492 (D.N.J. Mar. 12, 2014). The District Court denied his petition because his arguments lacked merit or were procedurally barred. Defendant then filed a second petition for PCR, which was denied as time-barred, followed by a motion to correct an illegal sentence, which was also denied.

In late 2022, defendant filed a Rule 3:20-1 petition to vacate the judgment of conviction and dismiss the indictment or, in the alternative, to release him on bail and order a new trial based on newly discovered evidence that constituted a

Brady[2] violation.  The petition was based on the State's failure to disclose that, one month before Wright testified at trial, she was indicted in Morris County for fourth-degree impersonation, N.J.S.A. 2C:21-17; third-degree forgery, N.J.S.A. 2C:21-1(a)(2); third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(4); and fourth-degree theft, N.J.S.A. 2C:20-3(a).  Wright had previously been admitted into the pretrial intervention (PTI) program in August 2004, but was terminated from PTI two weeks before her trial testimony.

During argument on the petition, the State conceded that it had a duty to disclose Wright's indictment and PTI discharge pursuant to Brady because the information served as favorable impeachment material that the State possessed prior to trial.  The State argued defendant was not entitled to a new trial because Wright's pending charges were not material to the overall criminal case.  The State pointed out Davis had also identified a photo of defendant as the shooter and Wright did not witness the shooting, but only saw defendant running with a gun afterwards.

The court reserved decision to obtain the testimony of defendant's trial attorney, who subsequently testified he never received any information on

---

[2]  Brady v. Maryland, 373 U.S. 83 (1963).

Wright's pending charges and PTI discharge and that if he had, he would have used the information to impeach her credibility.

On June 1, 2023, the court issued its oral decision on the record, concluding

> the combined testimony of . . . Wright and . . . Davis arguably bolstered one another. . . . Wright had personal knowledge of the defendant, testified to seeing him . . . running from the scene with a gun. Davis saw the man who shot [Timothy], and presumably him, as well, and identified him after being shown a second photo array. Although the defendant, as presented at trial, did not look like that same man, . . . Davis was given two photo arrays before he identified the defendant, it's not clear that . . . Davis's testimony alon[e] would not cause any doubt in the mind of the jury. Even . . . Wright's testimony does not include seeing the defendant with [Timothy] or pulling a trigger next to him. Without reason the State suggests that . . . Wright's testimony was not that strong. It is likely that the testimonials in concert allowed the jury to determine that the State had met its burden in proving beyond a reasonable doubt the defendant's [g]uilt.

The court found the State's violation of <u>Brady</u> deprived defendant of his right to procedural and substantive due process, and entered an order vacating the judgment of conviction, granting a new trial, and ordering defendant's detention in the interim.

We granted the State's motion for leave to appeal, in which it raises the following issues for our consideration:

15

POINT I

Wright's Morris County Indictment was Cumulative Impeachment Evidence which had no Reasonable Probability to Affect the Outcome Given the State's Compelling Proofs. The Trial Court Erred when it Concluded this Evidence was Material for Purposes of Establishing a <u>Brady</u> Violation and Meeting <u>Carter</u>'s[3] Newly Discovered Evidence Test.

    A.    The Trial Court Applied the Wrong Legal Standard for Materiality when Assessing the <u>Brady</u> Violation.

    B.    The Trial Judge made Factual Findings that were not Supported by Credible Evidence in the Record and Misapplied the Law to the Facts.

    C.    There was no Reasonable Probability that had Wright's Morris County Charges Been Disclosed to the Defense, the Result of the Proceeding Would have been Different.

    D.    The Trial Judge Incorrectly Concluded that Defendant met the Materiality Standard for Newly Discovered Evidence under <u>Carter</u>.

Our review of a motion court's decision on a request for a new trial based on a <u>Brady</u> violation presents a "mixed question of law and fact." <u>State v. Russo</u>, 333 N.J. Super. 119, 135 (App. Div. 2000) (citing <u>State v. Landano</u>, 271 N.J. Super. 1, 36 n.13 (App. Div. 1994)). <u>Accord</u> <u>State v. Marshall</u>, 148 N.J. 89, 185

---

[3] <u>State v. Carter</u>, 85 N.J. 300, 311-12 (1981).

16

(1997) (Marshall II).  We afford deference to the motion court's factual findings, but its "conclusion regarding whether defendant sustained [the] burden of proof is not entitled to the same deference as [the] factual findings."  Russo, 333 N.J. Super. at 135.  If the motion court applied the correct legal standard, we affirm unless the motion court's conclusion was "clearly erroneous."  Marshall II, 148 N.J. at 185.

Brady instructs that "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87.  Accord United States v. Bagley, 473 U.S. 667, 674 (1985) (summarizing ibid.).  The Brady rule's purpose

> is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur.  Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.
>
> [Bagley, 473 U.S. at 675.]

"Impeachment evidence, . . . as well as exculpatory evidence, falls within the Brady rule."  Id. at 676 (referencing Giglio v. United States, 405 U.S. 150, 154 (1972)).  A defendant is entitled to a new trial based on a Brady violation if

17

the defendant can show that the undisclosed information was not only favorable to the defense but material to the case. Carter, 85 N.J. at 311-12. "Materiality" refers to the evidence's probability of affecting the verdict, and this standard has evolved over time. Bagley, 473 U.S. at 681-82.

Initially, the test for materiality of a Brady violation hinged on the circumstances in which the violation occurred. United States v. Agurs, 427 U.S. 97, 111-13 (1976); see also Bagley, 473 U.S. at 678-81; Carter, 85 N.J. at 312. Agurs described three situations with different accompanying materiality tests: where the prosecutor used knowingly perjured testimony, Agurs, 427 U.S. at 103; where the defendant made a request for specific information and the prosecutor failed to disclose it, id. at 104; and the situation here: where the defendant made a general request for material or no request at all, id. at 106-07. In this third instance, where the defendant alleged a Brady violation, a request for a new trial turned on whether "the suppressed evidence might have affected the outcome of the trial." Id. at 104. In considering the character of the evidence in relation to the entire trial record, if the record established no reasonable doubt of guilt and the undisclosed Brady material did not change that, a new trial was not warranted. Id. at 112-13.

But "if the omitted evidence create[d] a reasonable doubt that did not otherwise exist, constitutional error ha[d] been committed." Id. at 112. Accord Carter, 85 N.J. at 312. And "if the verdict [was] already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." Agurs, 427 U.S. at 113.

Nine years later, the United States Supreme Court "abandoned the [Agurs] distinction between" information specifically requested by defendant and information generally requested, or not requested at all, in favor of a materiality test that mirrored the one set forth in Strickland v. Washington, 466 U.S. 668 (1984). Kyles v. Whitley, 514 U.S. 419, 433 (1995) (discussing Bagley, 473 U.S. at 682). As the Court subsequently explained in Kyles, regardless of the situation in which the Brady violation arose, the Bagley test instructs that "favorable evidence is material, and constitutional error results from its suppression . . . 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Id. at 433-34 (quoting Bagley, 473 U.S. at 682). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682.

Kyles emphasized the "[f]our aspects of materiality" discussed in Bagley. 514 U.S. at 434. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Ibid. (citing Bagley, 473 U.S. at 682). Rather,

> Bagley's touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."
>
> [Ibid. (quoting Bagley, 473 U.S. at 678).]

Second, the materiality standard "is not a sufficiency of evidence test":

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.
>
> [Id. at 435.]

20

Third, if the reviewing court finds constitutional error under <u>Bagley</u>, "there is no need for further harmless-error review." <u>Kyles</u>, 514 U.S. at 435. And fourth, undisclosed evidence must be "considered collectively, not item by item." <u>Id.</u> at 436.

Our Supreme Court has applied the <u>Bagley</u> "unitary standard" to all motions for a new trial based on a <u>Brady</u> violation regardless of whether the defendant made any request for the material. <u>Marshall II</u>, 148 N.J. at 155-56; <u>State v. Knight</u>, 145 N.J. 233, 247 (1996). The Court found no significant difference in the <u>Agurs</u> tests, as the ultimate question in any context was whether the suppressed evidence had a reasonable probability of affecting the verdict. <u>Ibid.</u> "In all instances, evidence is material for <u>Brady</u> purposes 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" <u>Marshall II</u>, 148 N.J. at 156 (quoting <u>Bagley</u>, 473 U.S. at 682).

With this backdrop in mind, we address the State's contentions. The State argues the motion court applied the "abandoned <u>Agurs</u> materiality standard for general requests for evidence," which required the court to find that the <u>Brady</u> material "create[d] a reasonable doubt that did not otherwise exist." We find this argument unavailing for two reasons.

First, the State's contention misreads Agurs and Bagley.  Bagley accepted the Agurs materiality test applicable when a defendant either made a general request or no request for the material, as the controlling test for a Brady violation.  This standard requires a showing that the suppressed evidence had a reasonable probability of affecting the verdict and, as articulated in Agurs, another way of conveying this requirement is that the suppressed evidence created a reasonable doubt that did not otherwise exist.  427 U.S. at 112.

Second, the motion court did not apply the incorrect standard in considering defendant's motion.  After discussing the standard for a new trial based on newly discovered evidence where a defendant does not allege a Brady violation, the court turned to the standard where a defendant alleges a Brady violation and analyzed defendant's motion under the latter.  In so doing, the court explained this case turned on whether the undisclosed information of Wright's pending charges and PTI discharge "create[d] a reasonable doubt . . . that did not otherwise exist" because the State conceded that the first two prongs of Brady were met.  Although the court cited Agurs, it applied the correct standard as set forth in Bagley.

The State also claims the motion court erred by finding Wright's pending charges and PTI discharge were material to the case because these facts had no

reasonable probability of creating a doubt that did not otherwise exist. In concluding otherwise, the State argues, the court improperly acted as a thirteenth juror, disregarded the significance of Davis's testimony, failed to consider that Davis's inability to identify defendant in court was based on defendant's changed appearance, and gave undue weight to Wright's testimony.

We find this argument unavailing because the record reflects the motion court applied the <u>Bagley</u> standard and reached the correct outcome. In considering the trial record in its entirety, the court noted the State's case relied heavily on identification testimony provided by two eyewitnesses. Because neither witness provided clear, consistent, unequivocal testimony identifying defendant as the shooter, the jury likely considered the witnesses' testimony together in finding defendant guilty.

The court acknowledged the State's argument that Davis's testimony alone could have supported the verdict and his inability to confirm his prior identification in court could have been based on defendant's changed appearance. But the ultimate question was not whether the verdict would have been the same even with the suppressed evidence, but rather, whether the undisclosed evidence had a reasonable probability to change the verdict or, stated another way, whether the undisclosed evidence "create[d] a reasonable

doubt that did not otherwise exist." <u>See</u> <u>ibid.</u> We agree with the court's finding that it did.

Wright's charges and discharge from PTI amounted to more than "mere" impeachment information or cumulative information. While the nature of the pending charges may not have been admissible under the Rules of Evidence, the fact that Wright had a pending indictment was highly material to any potential bias. <u>See</u> <u>State v. Bass</u>, 224 N.J. 285, 303 (2016) ("A defendant's claim that there is an inference of bias is particularly compelling when the witness is under investigation, or charges are pending against the witness, at the time that he or she testifies."). The suppressed information directly related to her credibility and honesty, particularly given her express reluctance to testify.[4]

As it was, Wright's testimony did not overwhelmingly implicate defendant. While she testified that she was familiar with defendant's appearance

---

[4] Defendant points out Wright's December 4, 2009 judgment of conviction indicated mitigating factor twelve (the willingness of defendant to cooperate with law enforcement authorities), N.J.S.A. 2C:44-1(b). It is unclear from the record before us whether this factor referred to her testimony in this matter or some other cooperation. Nevertheless, defendant should have been afforded the opportunity to cross-examine her on this issue. <u>See</u> <u>Bass</u>, 224 N.J. at 303 ("Indeed, '[i]n an unbroken line of decisions, our courts have held that the pendency of charges or an investigation relating to a prosecution witness is an appropriate topic for cross-examination.'") (citing <u>Landano</u>, 271 N.J. Super. at 40).

because she had known him for years, the circumstances in which she observed him at the scene were less than ideal. In addition, while she initially thought defendant was the shooter, she only became more certain of that after she heard other people talking and naming him.

Davis's identification was likewise assailable, especially given his in-court testimony defendant was not the shooter. Because the jury had many grounds on which to find Davis's testimony unreliable, we agree with the motion court's finding that Wright's testimony likely served to bolster his and conversely, his testimony bolstered hers. Indeed, the suppressed evidence "would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense." Kyles, 514 U.S. at 441.

Lastly, the State argues defendant also failed to show entitlement to a new trial under the newly-discovered evidence standard where no Brady violation is alleged. According to the State, the court concluded defendant established materiality under the non-Brady violation standard by establishing materiality under Bagley, without conducting a separate analysis. The State contends this was error because the non-Brady violation standard is more stringent than the Brady violation standard, and since defendant did not establish materiality under

the less stringent standard, he cannot establish it under the more demanding standard.

We reject this contention because the motion court found a new trial was warranted for the Brady violation, therefore there was no need for it to further address an inapplicable standard. And while the standard on a motion for a new trial based on a non-Brady violation has been described as more stringent, this descriptor refers to the additional requirement a defendant must demonstrate—that the new evidence could not have been discovered prior to trial through due diligence—which is not required in a Brady violation case. State v. Henries, 306 N.J. Super. 512, 534-35 (App. Div. 1997). However, the materiality element of both standards is effectively the same. Ibid.

In sum, none of the State's arguments establishes that the court's order granting defendant's motion for a new trial was "clearly erroneous." Marshall II, 148 N.J. at 185. The motion court's finding that the suppressed impeachment evidence had the capacity to change the verdict is premised on the application of the correct standard and is amply supported by the record.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3365-22